## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 21-CR-708(RCL)** |
| | : | |
| | : | |
| **LEO CHRISTOPHER KELLY** | : | |

### DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE

The Defendant, Mr. Leo Kelly, by and through his attorney Kira Anne West, respectfully requests that this Court suppress evidence in this case and in support of this motion, the Defendant asks for a hearing and submits the following:

### STATEMENT OF FACTS

On January 18th, 2021, a federal holiday, at about 8:30 a.m., Mr. Kelly was arrested at his place of work in Cedar Rapids, Iowa, by several federal agents. He was immediately handcuffed. They had him sign a consent form to search his truck. He was not mirandized. They found nothing, so took nothing. They transported Mr. Kelly to the local FBI office and questioned him while he was placed under arrest and during the trip to the jail. He was "in custody." Unbeknownst to Mr. Kelly, one of the agents had a recorder going that recorded the conversation in the car. However, there are several minutes where agents spoke to Mr. Kelly before putting him in the car. That was not recorded, or if it was, it's unintelligible.

They immediately began to question and speak to him without mirandizing him. Mr. Kelly was given his Miranda warning but only after a lengthy conversation with the agents. This is commonly known in Texas as "the Texas two-step" method of interrogation. It is a well known tactic of law enforcement.

1

The interview lasted approximately two hours. The crux of whether or not Mr. Kelly's waiver of his right to remain silent was voluntary and knowing starts before his questioning. Crucially, Mr. Kelly was questioned before his Miranda warning was given and when he tried to ask about his options, he was coerced. *See* exhibit 1.

When Mr. Kelly was being transferred to the local law enforcement office, the FBI Agents(hereinafter "TB" or "CM") said the following:1

TB:      (Pause) I'm sure Casey mentioned that, you know, you don't have to say anything until, you can talk a little bit more (VO)

LK:      Sure.

TB:      Enough to know what's going on.

LK:      Sure.

CM:      (Clears throat)

LK:      Yeah.

TB:      Yeah.

CM:      (Clears throat) (Pause) You think Scott will know?

TB:      Yup.

LK:      (Pause) Where are we going right now?

CM:      Our office.

LK:      Is that (VO)

CM:      We have an office in Hiawatha.

LK:      (UI)

CM:      (UI) about a ten minute drive.

LK:      Okay.

_____

1 This is a rough transcript done by the Govenrment.

CM:     Maybe quicker. We're off Boyson. Do you know where Lucky Penny is or anything like that?

LK:     Mm hmm. (UI)

CM:     We're right by there.

LK:     Okay. (Pause) (UI)

CM:     73022. (Pause) Transport started at 8:40, 8:41.

TB:     73022?

CM:     Yes. (Pause) Did you grow up in Cedar Rapids?

LK:     Yeah (UI)

CM:     During high school (UI)

LK:     We were home schooled but (VO)

CM:     Oh, really?

        …

CM:     Where'd you go to college at?

LK:     Coe College.

CM:     Okay.

LK:     Yeah.

CM:     When did you graduate?

LK:     2007.

CM:     7?

LK:     Yeah. 2007.

CM:     A Coe hawk.

LK:     Yeah.

CM:    (UI)

TB:    Did you play any sports or anything?

        LK:    No,…

        ( appears that everyone is now at the FBI office)

TB:    I'm gonna sit here.

CM:    You can take your mask off if you want to.

LK:    Fantastic.

CM:    (Clears throat) We can take your handcuffs off if you want.

LK:    Great.

CM:    Make you more comfortable.

LK:    Sure.

CM:    Okay. Just don't (VO)

LK:    Fantastic.

CM:    Just don't do anything stupid. I know you won't, but I gotta tell you.

LK:    Yes, sir.

CM:    Get this stuff off.

SI:    This did time, this did time out.

CM:    (UI) anything else. Okay, cool.

KM:    I got (UI) just in case.

CM:    Thank you so much. (UI) yup (UI)

KM:    You want two separate ones?

CM:    Yeah. Just small ones.

KM:     Yeah.

CM:     (Clears throat)

TB:     Casey.

CM:     Thank you. All right. All right. You wanna shut that door there? Too?

TB:     Do you need anything to drink or anything? Any, any of you guys?

LK:     Do you have a coffee?

TB:     Huh? Oh I can, we can brew some up.

LK:     I mean. If not, water would be fine.

TB:     Okay.

LK:     Thanks.

SI:     So I mean, yeah, we can brew some coffee if you want it. Otherwise I got water (Laughing)

LK:     Are we, like how long are we, I mean, do we have time to, I mean I don't even know (VO)

CM:     Yeah.

LK:     I mean (VO)

SI:     Yeah, yeah, yeah.

LK:     what are we gonna be doing?

CM:     Yeah.

LK:     Okay, yeah.

SI:     Yeah, we got it.

LK:     Great, that'd be fantastic. Thank you.

SI:     Okay.

LK:     Yeah.

CM:   I'm just gonna get organized here and go over some stuff with you, so.

LK:   Sounds good.

CM:   Obviously, I showed you a copy of the warrant and everything, right? So you understand (VO)

LK:   Yeah.

CM:   what that's all about.

LK:   Yeah.

CM:   Okay. I'm gonna fill this out 'cause we didn't take anything from your truck, okay? So let me fill this out real quick.

CM:   I'm gonna have you, I'm gonna have you sign this just to certify that we didn't take anything out of, out of that vehicle.

LK:   But I mean I haven't really checked that, right? I mean.

CM:   We, we didn't take anything and then if we did, we would have given you a hand receipt with what we took. This is the only thing we have right now right here, your license and your phone.

TB:   We would have shown you what we (VO)

LK:   Yeah.

TB:   or told you about what we would take.

LK:   Okay, okay.

CM:   Troy, do you wanna sign that other bottom part there?

TB:   (Pause) Do you need to use the restroom or anything?

LK:   No.

CM:   Grab that pen. Did you write down those times of transport?

TB:   Yeah.

CM:    Okay. Okay. All right, Leo. Before we get started, you know why we're here obviously. We, there's been back and forth with Nick (PH) and with, this morning with us but before we go any further we wanna advise you what your rights are. No matter who we talk to it's always important for them to understand that. I think you probably already understand. You seem like a really smart guy. But I'm, we're, policy. I'm gonna read it to you and I'll reiterate a couple points, okay? I'd love to talk to you today. By no means do you have to. So let's go over this real quick and then we'll go from there, okay?

LK:    Okay.

CM:    So your advice of rights. Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during the questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop at any time. So basically those are your rights and if you wanna have a conversation with us we can do that and you can just answer whatever you want, if you want to. Don't answer if you don't want to. Okay?

LK:    Okay.

CM:    This says, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." If you're willing to do that, I'm gonna ask you to sign this and then we're gonna sign it as well.

TB:    Do you wanna read it?

CM:    You, you can read it, too (VO)
LK:    Sure. Oh, I don't know. I mean. I mean, what, what happens if I don't sign it? I mean, like I mean I really am not that uncomfortable answering questions. But like I just (VO)

CM:    Yeah, I mean we've seen the, this, the media stuff already. So I mean, you know. But if you don't sign it, we would just take you for processing already at the jail.

LK:    But also like, but I don't know what processing means. Like I (VO)

CM:    They'll, they'll book you in, you know, prints, stuff like that.

LK:    Yeah.

CM:    You, 'cause right now you, what you will get is an initial appearance. That's gonna be the next thing that happens for you in the court, in the federal court system. But they're closed today so your initial appearance would be tomorrow morning or noon or somewhere around that, that timeframe.

LK:     Okay.

CM:     And that's where a judge tells you, "This is what's, what, what the charges are. You have the right to an attorney. Can you afford one? Do you want to get your own?" (VO)

LK:     Yeah.

CM:     "Or can we appoint one for you?" (VO)

LK:     Yeah.

CM:     That's when all that happens. So (VO)
LK:     Well, this is part of the investigation, gathering evidence, all of that.

CM:     The talk that we're gonna have today (VO)

LK:     Is what, yeah, yeah.

CM:     Yes.

LK:     Yes, yes.

CM:     Yup.

TB:     So if you're looking at that and you're reading it and you, you know, you understand the rights. And if you wanted to talk to us but you don't wanna sign the paper, you can still talk to us and you can, we'll just write on there, "Refused to sign."

CM:     Yeah.

TB:     If you're concerned about signing something I guess if you will.

LK:     Yeah. I mean I just like, I just don't know. I mean, did you guys watch that, the LifeSight (PH) News interview that's, is, whatever that's, what, I think that's why I'm probably on a list. Like people, like there's two million views on the thing on YouTube (VO)

TB:     Sure.

LK:     This kind of thing. Like I mean, so anyway, I don't know why I even brought that up.

CM:     No, it's fine. I mean no, it's just, we wanna have a conversation with you. Ultimately, Leo, this is a chance for you to give us your side of the story (VO)

LK:     Mm hmm.

8

CM:     and clear up any (VO)

LK:     Yeah, okay. All right (VO)

CM:     misunderstandings and things of that nature.

LK:     I'll, yeah, I'll talk. Can I, yeah.

CM:     (Clears throat) And like I said, Leo, at any point or if you don't want to, we can stop. And if there's a question you don't want to answer, you don't have to.

LK:     Sounds good to me.

TB:     (UI) what time do you wanna? Oh, you got it?

CM:     Yeah, I got it on there.

TB:     All right. (Pause) And then this other one.

CM:     Yeah. Hey, Kent?

KM:     What's up?

CM:     On my, at my desk (UI) at my desk there's a file cabinet (VO)

KM:     Yeah.

CM:     and in the third cabinet down if you open it, you'll see (UI)

KM:     Okay. There's some in here, too.

CM:     Like one of these.

KM:     Got it.

CM:     Okay. Thanks, bud. (Clears throat) That's Special Agent Moore, too. Kent Moore. He's sitting in with us today. Just so you know.

LK:     Okay.

CM:     He's another one of us. (Clears throat) Just wanna get a little bit of background stuff to continue that, what we were talking about earlier. Do you have any like social media accounts or any additional emails or anything like that? Phone number…

Law: statements

The Supreme Court has determined that the Fifth and Fourteenth Amendment's prohibition against compelled self-incrimination requires that custodial interrogation be preceded by advice to the Defendant that he has the right to remain silent and the right to the presence of an attorney. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Miranda warnings are required before custodial interrogation begins. *Id*. at 444-45.  Before it can use any statements produced through custodial interrogation, the government has the burden to show that. "the defendant 'voluntarily, knowingly and intelligently' waived [these] rights."  *J.D.B. v. North Carolina*, 564 U.S. 261, 269-70 (2011).  Moreover, the Government must show the statements were obtained without coercion or improper inducement. *Colorado v. Connolly*, 479 U.S. 157 (1986). Should a defendant make a statement, a court must examine the voluntariness of the particular statement and test whether the statement was freely given under the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also, Malloy v. Hogan*, 378 U.S. 1, 6- 7 (1964) (the constitutional inquiry is not whether the conduct of the law enforcement officers in obtaining the confession was shocking, but whether the confession was free and voluntary); *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). The government bears the burden of proving by a preponderance of the evidence that a statement allegedly made by a defendant was voluntary, or fits into exceptions to this general rule. *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *United States v. Garcia*, 780 F. Supp. 166, 171 (S.D.N.Y. 1991). Without a valid Miranda waiver, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions. *Pennsylvania v. Muniz,* 496 U.S. 582, 601-02 & n. 14. Accordingly, the questioning here by law enforcement officers did serve to elicit incriminatory admissions. The government bears the burden to demonstrate a knowing and intelligent waiver

10

of the privilege against self-incrimination when a defendant raises a colorable claim of

coercion. *See Miranda* 384 U.S. at 475; 18 U.S.C. § 3501(b) (setting forth criteria for

determining when a confession is "voluntary" or "coerced.") And when determining

voluntariness of a statement, the "totality of the circumstances" must be examined,

including the defendants individual characteristics and background, the setting in

which the statement occurred, and the details of the interrogation or

interview. *United States v. Elie*, 111 F. 3d 1135, 1143-44, (4ᵗʰ Cir. 1997); *United

States v. Pelton*, 835 F.2d 1067, 1071-72 (4ᵗʰ Cir. 1987). *Accord United States v. Van

Metre*, 150 F 3d 339, 348-49 (4ᵗʰ Cir. 1998).

     Most importantly, failure to give Miranda warnings and obtain a waiver of

rights before custodial questioning generally requires exclusion of any statements

obtained. *Missouri v. Siebert*, 124 S.Ct. 2601, 2602 (2004).  This "question first"

strategy by law enforcement was summarily struck down by the Court. *Id*.

Argument

     First, these statements were  obtained by improper inducement and were not

voluntary.  Mr. Kelly did graduate from college,  but has had no contact with the

criminal justice system.  After arresting him, taking his phone and drivers licence,

FBI agents started questioning Mr. Kelly before any warning was given, making him

comfortable and getting him to trust them.  Second, the agent  telling Mr. Kelly "Obviously,

I showed you a copy of the warrant and everything, right? So you understand (VO)…" and he

"seemed like a smart guy"  was geared to again get Mr. Kelly to trust them but also confused

Mr. Kelly by thinking that the arrest warrant that the officers showed him gave these same

agents legal permission to ask him anything they wanted. Crucially, when Mr. Kelly showed

hesitation,  and tried to ask questions, the agent cut him off before Mr. Kelly could request a

lawyer.   This was carefully orchestrated and planned by the agent. Third,  the agents told

Mr. Kelly it was his turn to "tell his side of the story and clear up any misunderstandings

and things of that nature."  There were no misunderstandings and agents lied to Mr. Kelly

to coerce him into making statements. They told him they would take him to jail if he didn't

sign the consent form and write "refused to sign" on the paperwork. Believing he had no

option, he signed.

<u>Motion to suppress evidence</u>

<u>Facts</u>

During the same interview, agents asked Mr. Kelly if they could have his phone. This too

was done deceitfully. Here is what the agents told Mr. Kelly:

CM:    Okay. Hmm? Nothing? Before we wrap this up, obviously you had your phone with you on the 6th of January. We would like to search the phone and I wanna ask you for consent to search that as well.

LK:    Okay.

CM:    While we're here. We, we would keep the phone today because, you know, it's part of you when, when you know, we take you into custody.

LK:    Okay.

CM:    Are you willing to give us consent to search the phone?

LK:    What do you guys, like what are you, like you just wanna see every, all the videos and whatever that's on there?

CM:    Essentially.

LK:    I mean I don't really care. I'll share it with you guys, yeah.

CM:    Okay.

LK:     I mean.

CM:     I'll have you sign the same form that you did before. And then when we're done with that process it, obviously it would come back to you. And we'll give you a receipt (VO)

LK:     How long will that be?

CM:     for that. It's hard to say honestly. But hopefully sooner rather than later. So (VO)

TB:     We try to turn things over as quickly as possible.

CM:     Yeah.

LK:     I mean I'm just trying to be as honest and open as I can (VO)

CM:     No, I know, and we certainly (VO)

LK:     here. Like I don't want like, I mean there's (VO)

KM:     Yeah.

LK:     all, I'm just (VO)

CM:     You have, you have been (VO)

TB:     (UI)

CM:     You have been. And we appreciate it. It's been a good conversation. And, and we certainly respect that and we, we wanna get p-we don't wanna hold onto this thing. We wanna give it back to you as soon as we can.

TB:     We definitely don't want to hold onto it.

CM:     Yeah. Ultimately we're responsible for it so by nature we don't want it.

LK:     Yeah.

CM:     We want it in and out so (VO)

LK:     Yeah.

CM:     I think that's probably something that we can do here which will speed up the process as opposed to it going somewhere else, but. We'll fill out the same consent form that we did earlier.

13

LK:     Mm hmm.

CM:     And I'll give you a hand receipt (VO)

LK:     Mm hmm.

CM:     for that and whatnot.

Law-search of phone

Agents can conduct a search based on consent only if that consent  was 1. voluntary and 2. came from someone authorized to give it. *United States v. Matlock*, 415 U.S. 164, 170 (1974). An individual's ignorance or knowledge of his right to refuse consent may be a factor in the court's consideration of whether consent was really voluntary. *United States v. Drayton*, 536 U.S. 194, 206-07 (2002). Whether or not the consent was voluntary depends on the totality of the circumstances. *See Shneckloth v.  Bustamonte,* 412 U.S. 218, 227 (1973). Courts consider whether the defendant has knowledge of the right to refuse consent, *Shneckloth,* at 228, the age, intelligence education and linguistic ability, *id.* at 229, the degree to which the consenting individual cooperated with the police; *see United States v. Rodriguez*, 525 F.2d 1313, 1315-16 10th Cir 1975, (consent not voluntary when defendant complied with border patrol agent's request to open suitcase because agents were in full uniform and carried weapons); the consenting defendant's attitude about the likelihood of the discovery of contraband, and the length of detention and the nature of questioning (such as coercion). *See United States v. Beauchamp*, 659 F.3d 560, 572(6th Cir. 2011)(consent not voluntary when defendant not advised of right to refuse, and was prevented from walking away).

Argument

14

Here, agents lie to Mr. Kelly and tell him that "[w]e, we would keep the phone today because, you know, it's part of you when, when you know, we take you into custody." This is patently false. As the Supreme Court made clear in *Riley,2* the police cannot search a cell phone incident to arrest.  573 U.S. at 386.  But that is pretty much what the agent tells Mr. Kelly. Mr. Kelly doesn't know this, but the agents do.  He had no idea he could refuse. And you can't lie to an arrestee to get consent to search a phone. Agents here did not read the consent form to Mr. Kelly before they asked for consent, and it does not appear that he was ever given an opportunity to read it. When agents make false claims in order to procure consent, that consent is invalid. Much like *United States v. Harrison*, 639 F3d 1273, 1280 (10th Cir 2011), where officers falsely claimed a bomb was planted at defendant's apartment, implying that defendant did not have right to refuse consent, so too the agents here implied the phone was part of Mr. Kelly's arrest. It wasn't. Deception and trickery, like the agents used here,  are among the factors that can render consent involuntary. *See  United States v. Sawyer,* 441 F.3d. 890, 895 (10th Cir. 2006); *United States v. McCurdy*, 40 F. 3d 1111, 1119 (10th Cir. 1994).

Mr. Kelly stands on his position that his statements made to law enforcement officers  (1)  were not voluntarily given by him, and/or (2) the Miranda waiver was improperly taken by law enforcement officers. He also argues that the consent he gave agents to search his phone was given under a pretext  and coercion by officers. In this regard, Mr. Kelly is asking this court to find that his subsequent waiver was not voluntary, knowing, and intelligent "under the totality of the circumstances," *See United States v. Straker*, 800 F.3d 570, at 624-25 (D.C. Cir. 2015).  Mr. Kelly also asks

---

2 *Riley v. California,* 573 U.S. 373 (2014).

15

the court to suppress  evidence found on his phone.

Respectfully submitted,

KIRA ANNE WEST

By:    _____/s/_____

Kira Anne West
DC Bar No. 993523
712  H Street N.E., Unit  509
Washington, D.C.  20002
Phone:   202-236-2042
kiraannewest@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify on the 15th day of November, 2022, a copy of same was delivered to the

parties of record, by  ECF and email  pursuant to the Covid standing order and the  rules of the

Clerk of Court.

_____/S/_____

Kira Anne West