**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:21-cr-00708-RCL-1** |
| | : | |
| **LEO CHRISTOPHER KELLY,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE**

The Court should deny defendant Leo Christopher Kelly's ("Kelly") Motion to Suppress Statements and Evidence, ECF 56, because under the totality of the circumstances he knowingly, voluntarily, and intelligently waived his right to remain silent as evidenced by his signed consent to interview form. Likewise, Kelly knowingly, voluntarily, and intelligently consented to the search of his cellular phone as evidenced by his consent to search form. Thus, Kelly's Motion to Suppress Statements and Evidence should be denied.

**BACKGROUND**

**A.      Relevant Procedural History**

On January 16, 2021, the Court issued a criminal complaint that charged Kelly with violating 18 U.S.C. §§ 1752(a)(1) and (2) (knowingly entering or remaining in any restricted building or grounds without lawful authority) and 40 U.S.C. §§ 5104(e)(2)(A), (C), and (G) (violent entry with intent to disrupt the orderly conduct of official business and disorderly conduct on Capitol grounds). ECF 1.

The Grand Jury issued a seven-count indictment that charged Kelly with violating 18 U.S.C. § 1512(c)(2) (Obstruction of an Official Proceeding) (Count One), 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds) (Count Two), 18 U.S.C. §

1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds) (Count Three), 40 U.S.C. § 5104(e)(2)(A) (Entering and Remaining on the Floor of Congress) (Count Four), 40 U.S.C. § 5104(e)(2)(C) (Entering and Remaining in Certain Rooms in the Capitol Building)(Count Five), 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building) (Count Six), and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building) (Count Seven). ECF 27.

On November 15, 2022, Kelly filed the instant motion to suppress. ECF 56.

**B.      Factual Background**

At 1:00 p.m., EST, on January 6, 2021, a Joint Session of the United States Congress convened in the United States Capitol building. The Joint Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election. With the Joint Session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol. As early as 12:50 p.m., certain individuals in the crowd forced their way through, up, and over erected barricades. The crowd, having breached police officer lines, advanced to the exterior façade of the building. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol. At approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to – and did – evacuate the chambers.

### *Kelly's Participation in the January 6, 2021 Riot.*

Kelly is a 37-year-old resident of Cedar Rapids, Iowa. Kelly was 35 years old when he was present in Washington, DC for the "Stop the Steal" rally on January 6, 2021. After attending the "Stop the Steal" rally on January 6 in Washington, D.C., Kelly marched to the U.S. Capitol with

scores of others. When Kelly arrived at the Capitol, he saw rioters on restricted Capitol grounds and other rioters climbing scaffolding set up for the inauguration and the stairs. Kelly joined the rioters and made his way up the stairs. United States Capitol Police ("USCP") closed-circuit video footage establishes that at 2:40 p.m., rioters shattered a glass Senate fire Door windowpane and opened the Senate Fire Door. The rioters overwhelmed the responding USCP officers. Some rioters forced their way into nearby Senate offices.

At approximately 2:43 p.m., Kelly and other rioters streamed into the breached Capitol. Kelly recorded their confrontation with USCP officers. Kelly also entered a breached Senate office and recorded an encounter with an individual in which Kelly stated, "[h]ey knock that shit off. Don't destroy this place. This is ours. Dude, knock it off."  At approximately 2:58 p.m., Kelly and others confronted USCP officers near the North Door Appointment Desk. Kelly and the others chanted, "Whose house? Our house." The officers tried to prevent them from advancing further into the Capitol, but they were overwhelmed. Kelly and the others made their way to the Senate chamber. Once inside the Senate chamber, Kelly stood on the Senate dais and used his cellular phone to record himself examining papers on the desk. He also took photographs of Senate material. At approximately 3:05 p.m., law enforcement officers expelled Kelly and the other rioters from the Senate chamber. At approximately 3:08 p.m., Kelly exited the Capitol and returned to his hotel.

At approximately 6:00 p.m., while wearing the same sweater worn during the Capitol breach, Kelly was interviewed by a LifeSiteNews.com reporter.[1] During the interview, Kelly made a number of admissions, including that he attended the "Stop the Steal" rally at the Ellipse and

---

[1] The About section of LifeSiteNews.com states it "is a non-profit Internet news service dedicated to issues of life, family, and many related issues." https://www.lifesitenews.com/about. Last accessed November 15, 2022.

then marched to the Capitol where he saw people climbing the scaffolding and the stairs pho. Kelly told the reporter that he then joined them. He entered the Capitol with others and eventually made his way to the Senate chamber where he and others prayed. The reporter then broadcast a video clip Kelly shared with LifeSitenews.com that Kelly recorded while inside the Senate chamber.

On January 10, 2021, the FBI received numerous anonymous tips identifying Kelly as an individual inside the Capitol unlawfully on January 6, 2021.

On January 14, 2021, a Deputy United States Marshal and acquaintance of Kelly contacted the FBI field office in Iowa and informed an agent that Kelly called him after January 6, 2021 and told him that if a warrant was issued for Kelly's arrest, Kelly would surrender. Ex. 1 – Redacted FBI Report dated January 14, 2021.

On January 16, 2021, the Court issued the Criminal Complaint and arrest warrant. ECF 1, 10.

On January 18, 2021, at approximately 8:30 a.m., FBI Agents Casey Maxted, Troy Bronner, and Kent Moore arrested Kelly at Kelly's place of business, a family-owned internet company in Cedar Rapids, Iowa. ECF 67-3 – Redacted Transcription of Audio Recording: Custodial FBI interview of Leo Kelly (January 18, 2021) at 1, 4-5. The agents placed Kelly in a vehicle and Kelly agreed to a search of his truck and signed a consent to search form. *Id.* at 1-2. Agent Maxted asked Kelly if he was comfortable and Kelly responded, "I'm comfortable." And "[a]s comfortable as I can be." *Id.* at 2. Agent Maxted secured Kelly's seatbelt and informed Kelly of the charges:

> All right. So I'm just gonna review this with you real quick since you asked. This is the arrest warrant, okay? It's out of the District of Columbia for you. And the offense is briefly described as follows: knowingly entering and remaining in a restricted building or grounds without lawful authority and violent entry with intent to disrupt the orderly conduct of official business and disorderly conduct on capitol grounds. Those are the two charges.

*Id.* At Agent Maxted's request, Kelly provided routine booking information, including his date of birth, residential address, and email address. *Id.* at 4. Kelly also provided the family business address and historical information about the business. *Id.* at 4-5. Kelly then initiated conversation with the agents when he said, "You know, you guys are, I was not impressed with how quickly you found me. I've had like reporters from France who have tracked me down and (VO)."[2] Agent Bronner stated, "I'm sure [Agent Maxted] mentioned that, you know you don't have to say anything until, you can talk a little bit more." *Id.* at 5. "Sure," Kelly responded.  "Enough to know what's going on," Agent Bronner continued to which Kelly responded once more, "Sure." *Id.*

 During the remainder of the trip, Kelly and the agents discussed Kelly's growing up in Cedar Rapids, his high school, and Kelly initiated a conversation regarding his acquaintance with a Bureau of Alcohol, Tobacco, Firearms, and Explosives agent. *Id.* at 6-9. Kelly also told the agents that he graduated college in 2007. *Id.* at 8-9.

When they arrived at the FBI field office, Agent Maxted offered to remove Kelly's handcuffs, to which Kelly responded, "great." *Id.* at 10. Once inside the office, Kelly was provided coffee and afforded an opportunity to use the restroom, which he declined. *Id.* at 12.   The agents then informed Kelly that nothing of evidentiary value was found during the search of his truck and presented Kelly with a receipt.

Thereafter, Agent Maxted and Kelly had the following exchange:

Agent Maxted: Okay. Okay. All right, Leo. Before we get started, you know why we're here obviously. We, there's been back and forth with Nick (PH) and with, this morning with us but before we go any further we wanna advise you what your rights are. No matter who we talk to it's always important for them to understand that. I think you probably already understand. You seem like a really smart guy. But I'm, we're, policy. I'm gonna read it to you and I'll reiterate a couple points,

---

[2] VO is an acronym for voice over.

okay? I'd love to talk to you today. By no means do you have to. So let's go over this real quick and then we'll go from there, okay?

Kelly: Okay.

Agent Maxted: So your advice of rights. Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during the questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop at any time. So basically those are your rights and if you wanna have a conversation with us we can do that and you can just answer whatever you want, if you want to. Don't answer if you don't want to. Okay?

Kelly: Okay.

Agent Maxted: This says, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." If you're willing to do that, I'm gonna ask you to sign this and then we're gonna sign it as well.

Agent Bronner: Do you wanna read it?

Agent Maxted: You, you can read it, too (VO)

Kelly: Sure. Oh, I don't know. I mean. I mean, what, what happens if I don't sign it? I mean, like I mean I really am not that uncomfortable answering questions. But like I just (VO)

Agent Maxted: Yeah, I mean we've seen the, this, the media stuff already. So I mean, you know. But if you don't sign it, we would just take you for processing already at the jail.

Kelly: But also like, but I don't know what processing means. Like I (VO)

Agent Maxted: They'll, they'll book you in, you know, prints, stuff like that.

Kelly: Yeah.

Agent Maxted: You, 'cause right now you, what you will get is an initial appearance. That's gonna be the next thing that happens for you in the court, in the federal court system. But they're closed today so your initial appearance would be tomorrow morning or noon or somewhere around that, that timeframe.

Kelly: Okay.

Maxted: And that's where a judge tells you, "This is what's, what, what the charges are. You have the right to an attorney. Can you afford one? Do you want to get your own?" (VO)

Kelly: Yeah.

Agent Maxted: "Or can we appoint one for you?" (VO)

Kelly: Yeah.

Maxted: That's when all that happens. So (VO)

Kelly: Well, this is part of the investigation, gathering evidence, all of that.

Agent Maxted: The talk that we're gonna have today (VO)

Kelly: Is what, yeah, yeah.

Agent Maxted: Yes.

Kelly: Yes, yes.

Agent Maxted: Yup.

Agent Bronner: So if you're looking at that and you're reading it and you, you know, you understand the rights. And if you wanted to talk to us but you don't wanna sign the paper, you can still talk to us and you can, we'll just write on there, "Refused to sign."

Agent Maxted: Yeah.

Agent Bronner: If you're concerned about signing something I guess if you will.

Kelly: Yeah. I mean I just like, I just don't know. I mean, did you guys watch that, the LifeSight (PH) News interview that's, is, whatever that's, what, I think that's why I'm probably on a list. Like people, like there's two million views on the thing on YouTube (VO)

Agent Bronner: Sure.

Kelly: This kind of thing. Like I mean, so anyway, I don't know why I even brought that up.

Agent Maxted: No, it's fine. I mean no, it's just, we wanna have a conversation with you. Ultimately, Leo, this is a chance for you to give us your side of the story (VO)

Kelly: Mm hmm.

Agent Maxted: and clear up any (VO)

Kelly: Yeah, okay. All right (VO)

Agent Maxted: misunderstandings and things of that nature.

Kelly: I'll, yeah, I'll talk. Can I, yeah.

Agent Maxted: (Clears throat) And like I said, Leo, at any point or if you don't want to, we can stop. And if there's a question you don't want to answer, you don't have to.

Kelly: Sounds good to me.

*Id.* at 14. At 8:56 a.m., Kelly signed FD-395, an FBI Advice of Rights form, which advised Kelly

of the following rights:

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during the questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

ECF 67-2 – FBI Advice of Rights, FD-395 form.

Kelly then made incriminating statements. Among those statements were that after

attending the "Stop the Steal" rally at the Ellipse he and others marched to the Capitol. ECF 67-3

– Redacted Transcription of Audio Recording: Custodial FBI interview of Leo Kelly (January 18, 2021) at 24-25. Kelly described the scene when he and others reached the Capitol as follows:

> So then you walk up there and you, we got to the Capitol and by the time I got there, there were already people like way up like, you know, I don't know if you guys have ever been there but you look up the hill and there's this scaffolding which I think is what the bleachers are now. And people had climbed up on that and people had, they were just all over the grounds. And I was just, I wanted to see it.
>
> ****
>
> You know? And I wanted to get, you know, and so I just followed 'em up and kept walking. And I don't know, when you're in a group like that and you're kind of moving around in a mass, I guess what I would expect is at some point you run up against whatever the building's normal fence would be or something. And I don't remember ever seeing that. Like I assume someone took it out of the way or whatever. I don't know. But you just keep walking and walking and walking, getting closer and closer and closer and there's always thousands more people ahead of you so I just kept going.
>
> ****
>
> And eventually, yeah, we got up there and there was just thousands of people everywhere and I can't remember. There were some people I actually saw coming out of the building, like regular, just folks. And I guess what's weird s-I [sic] read this. I don't know if it's true but apparently according to the police report in D.C. the, there was people in the building or the building was breached or something like that before (Pause) the President even got done speaking or something like that. Like it's just something like, there's just all this weird stuff that happened around the whole event.
>
> ****
>
> But by the time I show up there, they're like swarming up the scaffolding and like I mean, you know, I mean maybe we should have known better. I mean possibly. Like, but you're in a group and you just walk and it's just like well what's going on here? I don't know. It's like (Laughing).

*Id.* at 25-26. When asked if he knew of advanced planning to enter the Capitol, Kelly denied having such prior knowledge but stated, "We certainly knew what the schedule was for that day. They were going to certify the, or I can't remember if it's called certify or whatever, the election results, which was why the whole event (VO)." *Id.* at 27. Kelly also explained how he entered the Capitol:

9

> There was a door. I was up in like I don't know, off to the side. Whatever. There's like the middle of the building and then somehow wherever I had flown with the crowd up there. And there was a group of people actually coming out of some doors or windows or something that they had broken. But they were, there was already people coming out by the time I got up there. And then something happened off to my left where there was another door and somebody started, I don't know, hitting it with something or something. I don't know if they were trying to break the window or what. And I do not remember how that door got opened, if the person forced it open or if the police from the inside opened it. Or, I don't know if they were police or what they were but (VO).

*Id.*

Kelly made other admissions, including that he did not have a badge or credentials that would allow him into the Capitol, *id.* at 28; agreed with Agent Bronner's characterization that a police line was "breached," *id.* at 30; that the group inside the Capitol significantly outnumbered the police, *id.* at 31; and informed the agents that he and 20-30 people made their way into the Senate chamber, *id.* at 36.  Additionally, Kelly identified himself in a YouTube video. *Id.* at 38. When asked if there was anything he wanted the agents to know, Kelly explained, "[the] crowd was not a violent bunch of psychopaths." *Id.* at 44. He blamed the event on the failure of police to stop the group when he said:

> Like it wouldn't have taken much to like stopped the group. Now clearly we went up there and we did what we did. But it would not have been, like all you needed was like a few police officers and some actual barricades and it would have just taken the wind out of everybody's sails and, and like we would have just stood around and didn't, like (VO).

*Id.* at 45.  When asked if in hindsight he thought his actions were the right thing to do, Kelly said, "No. I don't, actually." And further that, "I don't think I had the, an authorized right to be in that building, you know?" *Id.* at 46.

As the interview was concluding, Agent Maxted asked Kelly for consent to search his phone. *Id.* at 49. Kelly asked, "What do you guys, like what are you, like you just wanna see every, all the videos and whatever that's on there?" *Id.* Agent Maxted responded, "Essentially." *Id.*  Kelly

replied, "I mean I don't really care. I'll share it with you guys, yeah." *Id.* Kelly signed FD-26, an

FBI Consent to Search form, and provided the password to unlock the phone.  The consent form

read:

> I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of:
> (Describe the person(s), place(s), or things(s) to be searched.)
>
> I have been advised of my right to refuse to consent.
>
> I give this permission voluntarily.
>
> I authorize these agents to take my items which they determine may be related to their investigation.

Ex. 2 - FBI Consent to Search, FD-26 form. The make of Kelly's cellular phone, a Samsung Galaxy

S10E, and password was listed on the form. *Id.*

The FBI later recovered video and photographs relevant to the investigation of Kelly's

activities on January 6, 2021.

## LEGAL STANDARD

### A.  Statements

The Fifth Amendment's prohibition against compelling a person to incriminate himself

requires a law enforcement officer to provide that person with certain warnings after "be[ing] taken

into custody or otherwise deprived of his freedom in any significant way."  *Miranda v. Arizona*,

384 U.S. 436, 444.  But the officer's obligation to administer *Miranda* warnings attaches "only

where there has been such a restriction on a person's freedom [of movement] as to render him 'in

custody.'"  *Stansbury v. California,* 511 U.S. 318, 322 (1994) (per curiam) (quoting *Oregon v.*

*Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)).  Custody for purposes of the Fifth Amendment

is a "term of art" that refers to circumstances generally thought "to present a serious danger of

coercion."  *Howes v. Fields,* 565 U.S. 499, 508-09 (2012).

Determining whether an individual is in custody, and therefore entitled to *Miranda* warnings, requires two "discrete inquiries." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The first inquiry asks "whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes,* 565 U.S. at 509 (citations, quotation marks, and brackets omitted). Because not every restraint on movement amounts to custody, however, courts also undertake a second inquiry: "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." *Id.* Both inquiries are objective—i.e., "from the perspective of a reasonable person in the suspect's position," *Crawford,* 372 F.3d at 1059 (citing *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984))—and underscore the "ultimate" inquiry: "was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (quoting *Thompson*, 516 U.S. at 112)). Mere "presence of the officer as a figure of governmental authority does not, by itself, constitute the 'show of authority' necessary to make a reasonable person feel unfree to leave." *Goddard*, 491 F.3d 457, 461 (quoting Gomez v. Turner, 672 F.2d 134, 142 (D.C. Cir. 1982)).

If the defendant is considered to be "in custody," to overcome a motion to suppress, the government must prove by a preponderance of evidence that a defendant's waiver of *Miranda* rights was voluntary, knowing, and intelligent. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *see also United States v. Harris*, 2021 WL 1167623, at *3 (D.D.C. Mar. 26, 2021). A waiver of *Miranda* rights is voluntary if it was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). A waiver is knowing and intelligent if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran,* 475 U.S. at 421. However,

"[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). "'It is only when the evidence in the case shows that the defendant could not comprehend even the most basic concepts underlying the *Miranda* warnings that the courts have found an unintelligent waiver.'" *United States v. Roberson*, 573 F.Supp.3d 2019, 219 (D.D.C. 2021) (quoting *Collins v. Gaetz*, 612 F.2d 574, 588 (7th Cir. 2010).

An implied waiver can be found from the particular facts and circumstances of the accused and the interrogation. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *North Carolina v. Butler,* 441 U.S. 369 (1979). Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent. B*erghuis*, 560 U.S. at 384. "An express written . . . statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver." *Butler*, 441 U.S. at 373.

### B.  Searches

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. Generally, searches and seizures are unreasonable and thus invalid unless based on probable cause and executed pursuant to a warrant. *See Katz v. United States.*, 389 U.S. 347, 357 (1967) (holding the Fourth Amendment imposes presumptive warrant requirement for searches and seizures). There are, however, exceptions to the warrant requirement. One such exception is consent searches.  *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219-226 (1973) (holding a valid consent to search turns on the totality of the circumstances and that the test is whether a defendant's will has been "overborne in particular case" as "assessed by all the surrounding circumstances"). "While knowledge of the right to refuse consent is one factor to be taken into account, the

government need not establish such knowledge as the sine qua non of an effective consent." *Id.* at

227.    A defendant's consent may be express or implied, but this waiver of Fourth Amendment

rights does not need be knowing and intelligent. *Id.* at 235.

Courts examine a number of factors to determine whether a defendant's consent was given

voluntarily under the totality of the circumstances. These factors include a defendant's knowledge

of the constitutional right to refuse consent. *United States v. Mendenhall*, 446 U.S. 544, 558-59

(1980); *see e.g. United States v. Barnett,* 989 F.2d 546, 556 (1st Cir. 1993)(holding the defendant's

consent to search was voluntarily given because *Miranda* warnings put the defendant on notice of

his right to refuse to cooperate). Other factors include a defendant's age, intelligence, language

ability, education, cooperation with police, length of detention, attitude about the likelihood police

would discover contraband, the use of physical punishment, or other coercive police tactics.

*Schneckloth*, 412 U.S. at 226 (citing voluntariness factors, including but not limited to, a

defendant's age, education, whether the defendant's advised of his rights, nature of the

questioning, and length of detention).

## ARGUMENT

**I.    Kelly's Statements Given to FBI Agents on January 18, 2021 Were Given After Kelly Voluntarily, Knowingly, and Intelligently Waived His *Miranda* Rights.**

Kelly claims that his "statements were obtained by improper inducement and were not

voluntary." ECF 5667 at 11. This is so Kelly claims because the agents questioned him before

administering any warnings and made him comfortable, which caused Kelly to trust them. *Id.*

Second, and relatedly, Kelly claims that when an agent mentioned that he previously showed Kelly

the arrest warrant and referred to Kelly as a "smart guy," these statements were "geared to again

get Mr. Kelly to trust them but also confused Mr. Kelly by thinking that the arrest warrant that the

officers showed him gave these same agents legal permission to ask him anything they wanted."

*Id.* at 11-12. Lastly, Kelly claims the agents lied to him to "coerce him into making statements." *Id.* at 12.  Specifically, he claims the agents told Kelly that "They would take him to jail if he did not sign a consent form and write 'refused to sign' on the paperwork." *Id.*

Kelly's motion to suppress his statements is without merit and should be denied because under the totality of the circumstances he made a knowing, voluntary, and intelligent waiver of his *Miranda* rights and consented to the interview. Here, none of the coercive factors are present that would demonstrate Kelly did not make a knowing, voluntary and intelligent waiver of his *Miranda* rights. At the time of Kelly's arrest, he was 35 years old.[3] He is a college graduate and Vice President of Finance at 2PiFi, a family-owned business. ECF 67-3 – Redacted Transcription of Audio Recording: Custodial FBI interview of Leo Kelly (January 18, 2021) at 4, 15, 52.

Kelly was comfortable with law enforcement agents. On January 7, 2021, as he drove back to Iowa, Kelly contacted a Deputy United States Marshal he knew and told the Deputy Marshal that he was willing to surrender if law enforcement officers intended to arrest him for his actions on January 6, 2021. Ex. 1 – Redacted FBI Report dated January 14, 2021. Thus, Kelly was aware of the possibility that law enforcement officers could arrest him. In fact, when FBI agents arrested Kelly on January 18, 2021, he said, "You know, you guys are, I was not impressed with how quickly you found me. I've had like reporters from France who have tracked me down and (VO)." ECF 67-3 – Redacted Transcription of Audio Recording: Custodial FBI interview of Leo Kelly (January 18, 2021) at 5. Additionally, Kelly and the agents discussed Kelly's experiences in high school and Kelly's acquaintance with an ATF agent. *Id.* at 7-9.

Other factors establish that under the totality of the circumstances Kelly's waiver of his *Miranda* rights were voluntary and thus his statements are admissible. The agents uncuffed Kelly

---

[3] The government redacted Kelly's date of birth.

prior to the interview. *Id.* at 10. He was provided coffee, permitted an opportunity to use the restroom, and he signed a *Miranda* waiver form. *Id.* at 10-11. Additionally, the tone and manner of the questioning reveal no coercion. *See generally* Ex. 3 – Audio Recording: Custodial FBI interview of Leo Kelly (January 18, 2021).[4]

Against this backdrop, Kelly claims he was coerced through deception. Specifically, that the agents gained Kelly's trust through pre-*Miranda* questioning. The questioning consisted of routine biographical information which is an exception to *Miranda. United States v. Peterson*, 506 F. Supp. 2d 21 (D.D.C. 2007). Moreover, Kelly initiated much of the conversation between he and the agents. Kelly has also failed to identify with specificity any pre-*Miranda* statements that were deceptive. Finally, Kelly's claim that the agents coerced Kelly to waive his *Miranda* rights by telling him they would take him to jail when read in context and under the totality of the circumstances reveals no deception. Read in context, the agents explained the arrest process and what would happen once the interview was terminated and that Kelly could speak to the agents without signing the consent form.   ECF 67-3 – Redacted Transcription of Audio Recording: Custodial FBI interview of Leo Kelly (January 18, 2021) at 14.

As such, the government has established by a preponderance of evidence that Kelly's *Miranda* waiver was knowingly, voluntarily, and intelligently entered and the Court should deny Kelly's motion to suppress his statements.

## II.  Kelly Knowingly, Voluntarily, and Intelligently Consented to the Search of his Phone.

Kelly also moves to suppress the search of his phone. *Id.* at 14-16. Kelly claims the agents tricked him into consenting to the search of his phone by implying he had no right to refuse. *Id.* at 15-16. This argument is also without merit under the totality of the circumstances because Kelly

---

[4] Exhibit 3 will be filed pursuant to Local Rule 49(e)(1).

knowingly, voluntarily, and intelligently consented to the search of his phone after a lawful arrest, previously waived his right to remain silent, and executed a consent to search form.

Here, FBI agents arrested Kelly on a lawfully issued warrant. Kelly then knowingly, voluntarily, and intelligently waived his *Miranda* rights and as such his will was not overborne and he was aware that he could refuse cooperating with the agents. Further, Kelly was a 35-year-old college graduate and Vice President of a family-owned company who was not subjected to abusive or coercive language or treatment during the process, and he signed a waiver form that specifically advised him of his right to refuse to consent. *See generally* ECF 67-3 – Redacted Transcription of Audio Recording: Custodial FBI interview of Leo Kelly (January 18, 2021); *see also* Ex. 3 – Audio Recording: Custodial FBI interview of Leo Kelly (January 18, 2021); ECF 67-2 – FBI Advice of Rights, FD-395 form; Ex. 2 - FBI Consent to Search, FD-26 form.

Against this backdrop, Kelly's primary argument to suppress evidence recovered from Kelly's phone is that, like with his claim to suppress his statements, the agents deceived Kelly, and regarding his phone, deceptively did not inform him of his right to refuse consent to search the phone. These arguments fail because there was no deception.

First, when Agent Maxted asked Kelly for his consent to search Kelly's phone, Kelly asked, "What do you guys, like what are you, like you just wanna see every, all the videos and whatever that's on there?" ECF 67-3 – Redacted Transcription of Audio Recording: Custodial FBI interview of Leo Kelly (January 18, 2021) at 46. There was no deception in Agent Maxted's response. He candidly responded, "Essentially." Kelly's reply, "I mean I don't really care. I'll share it with you guys, yeah[,]" *id.*, signified Kelly understood the scope of the intended search. Kelly then read and

signed the consent form.[5] Further, Kelly's main argument – that the agents did not explicitly advise Kelly that he could refuse to consent to the search of his phone – fails because the consent form advised Kelly that he could refuse to consent to the search. *United States v. Roberson*, 573 F. Supp. 3d 209, 232 (D.D.C. 2021) (holding a defendant's consent to search is deemed voluntary when the defendant signs a form that stated in clear and unambiguous terms the defendant could deny permission to conduct the search and was not threatened, ordered or forced to submit to the search). Lastly, the agents were not required to specifically inform Kelly of his right to refuse to consent to the search of his phone. *See Bustamonte,* 412 U.S. at 227 (holding a law enforcement officer is not required to explicitly advise a defendant that the defendant has a right to refuse his consent to search, though that factor is relevant to the totality of the circumstance)*; see also Roberson,* 573 F. Supp. at 232 (same).

As such, Kelly's consent to search his phone was knowingly, voluntarily, and intelligently given, and the Court should deny Kelly's motion to suppress evidence recovered from his phone.

**III.    Even If There Were a Fourth Amendment Violation When Agents Looked at Kelly's Cellular Phone, the Evidence Would have Been Lawfully Obtained**

Additionally, even if Kelly did not provide knowing, voluntary, and intelligent consent to search his cellular phone, the evidence is nevertheless admissible under the "independent source" doctrine. The "independent source" doctrine "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix v. Williams*, 467 U.S. 431, 443 (1984). In other words, "evidence initially discovery during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial

---

[5] Kelly does not contend that he did not read the Consent to Search form. Even if he had alleged he did not read the form that would not invalidate his consent. *See Roberson*, 573 F. Supp. 3d at 233 (holding "[a] defendant's mere failure to read a consent form when he had ample opportunity to do so does not invalidate the resulting consent.").

illegality," is admissible.  *United States v. Green*, 39 F.4th 510, 513 (8th Cir. 2022).  To prevail under the independent source doctrine, the government must show that: (1) law enforcement would have sought a warrant to seize the evidence even if the unlawful search never occurred, and (2) probable cause supported the warrant after excluding all information obtained by the unlawful search.  *Id.*

Here, even if Kelly did not provide the requisite consent to search his cellular phone (a contention we wholly dispute), the evidence obtained from his cellular phone would have been obtained by investigators through a search warrant.  For example, FBI agents seized Kelly's cellular phone upon his arrest. The phone contained evidence of Kelly's criminal activity in the Capitol, which included Kelly video recording other rioters in the Capitol and the Senate chamber and photographed a Senate document. Additionally, Kelly provided LifeSitenews.com with a video clip of a recording made while he was in the Senate chamber. LifeSitenews.com  broadcast the clip on the evening of January 6, 2021. As such, investigators would have sought a warrant for the cell phone, as is consistent in other cases involving crimes committed on January 6.

Regarding the second prong, probable cause supports the warrant independent of any tainted information gathered during the review of Kelly's cellular phone at the initial interview. "Probable cause exists, when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place."  *Green*, 39 F.4th at 513.  As explained above, there was a fair (and compelling) probability that evidence of crime would have been found on Kelly's phone because there is ample evidence demonstrating that Kelly videoed much of his criminal activity on his cellular phone. For example, Kelly stood on the Senate dais and used his cellular phone to record himself examining papers on the desk and he took photographs of Senate material. The LifeSitenews.com

reporter then broadcasted Kelly admitting to this conduct and broadcasted a video clip that Kelly took from his cellular phone from inside the Capitol.

Therefore, probable cause supported the issuance of a warrant to search the cellular phone even without the allegedly tainted search.  As such, Kelly's motion to suppress evidence recovered from his cellular phone should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  */s/ Michael G. James*
MICHAEL G. JAMES
Assistant United States Attorney
N.Y. Reg. No. 2481414
Office of the United States Attorney
Eastern District of North Carolina
(on detail to the USAO-DC)
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Mike.James@usdoj.gov
Telephone: (919) 856-4530

**CERTIFICATE OF SERVICE**

This is to certify that on November 29, 2022, I, the undersigned Assistant United States Attorney, served on copy of the foregoing response to the defendant's motion to suppress via CM/ECF on the counsels of record in this action.

By: /s/ *Michael G. James*
MICHAEL G. JAMES
Assistant United States Attorney
N.Y. Reg. No. 2481414
Office of the United States Attorney
Eastern District of North Carolina
(on detail to the USAO-DC)
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Mike.James@usdoj.gov
Telephone: (919) 856-4530