**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **CASE NO. 1:21-cr-708-RCL** |
| **LEO CHRISTOPHER KELLY,** | : | |
| | : | |
| **Defendant.** | : | |

**MOTION IN LIMINE TO EXCLUDE IRRELEVANT EVIDENCE**
**RELATED TO DEMONSTRATIONS**

      The defendant, through counsel, has notified the government of over one hundred exhibits related to the case scheduled for jury trial. Such exhibits are delineated by "series." The "100 series" appears to be 12 exhibits (with 21 subparts) related to documents obtained from or provided by the U.S. Capitol Police related to January 6, 2021. The exhibits are briefly described as follows:

- **Exhibit 101** is a compilation of six demonstration permits for groups who were authorized, by U.S. Capitol Police, to protest or demonstrate on Capitol grounds on January 6, 2021. None of those groups, however, were authorized to protest within the Restricted Perimeter.

- **Exhibit 102** is a lengthy document detailing the timeline of events for January 6, 2021.

- **Exhibit 103** consists of multiple screenshots and documents related to a U.S. Capitol Police Civil Disturbance Unit (CDU), a unit dedicated to responding to unlawful protests and assemblies on Capitol grounds. The documents pertain to an operational plan in advance of January 6, 2021, to prepare officers for expected or unexpected events. It includes information about the permitted use of force, or the expected demonstrations occurring on Capitol grounds.

- **Exhibit 104** is an "After Action Report" produced by the U.S. Capitol Police.

- **Exhibit 106** is a screenshot of a "Schedule of Events" pertaining to a "Jericho March."

- **Exhibit 107** is a screenshot of a Schedule of Events pertaining to the Jericho March, as observed on an internet website.

- **Exhibit 108** is another screenshot related to the Jericho March.

- **Exhibit 110** appears to be a screenshot related to a shofar, a religious musical instrument typically made from a ram's horn.

- **Exhibit 111** appears to be a screenshot related to the price of a shofar, on Amazon.com.

To start, it is not clear why any of this evidence is relevant to the crimes charged against the defendant. While the government acknowledges that this evidence may become relevant at a later time, based on a conditional proffer or the development of facts at trial, at first blush, none of the above documents or information pertain to the defendant, or more importantly, knowledge possessed by the defendant.

Upon information and belief, however, we believe that all of these exhibits generally pertain to the defendant's irrelevant attempt to show that protests were lawfully permitted within the restricted perimeter on January 6, 2021. They were not. Instead, over the course of several cases, with different defendants, the defendant's counsel has attempted to weave together a narrative that is not supported by the facts. This history and effort contextualizes the exhibits at issue in this case. We start with defense Exhibit 103.

*Defense Exhibit 103*

In *United States v. Daniel Egtvedt*, 21-cr-177-CRC, defense counsel called U.S. Capitol Police Lieutenant Scott Grossi on behalf of the defendant. Germane to this motion, Lt. Grossi testified that he was the individual who reviewed demonstration permits requested for Capitol grounds on January 6, 2021. *See* 12/06/2022 Tr., at 467-480. Lt. Grossi explained that he reviewed and approved First Amendment demonstrations as part of his employment, including any demonstrations intended to take place on January 6, 2021. *Id.* at 468. If approved, he would "send it up the chain" to the Chief of Police, who on January 6, 2021, was Steven Sund. *Id.* Chief Sund

would then approve or deny the permit. Lt. Grossi testified that no organizations were permitted to testify within the restricted perimeter, or specifically, on the Capitol steps. *Id.* at 473.

Several months later, in *United States v. Anthony Griffith*, 21-cr-244-CKK, the same counsel filed a brief related to this exact same line of inquiry. *See* ECF No. 132. This time, counsel subpoenaed multiple members of the U.S. Capitol Police, as well as members of its Office of General Counsel, to testify about (now) Exhibit 103, claiming that the inquiry was an attempt at determining the contours of the restricted perimeter. *Id.* at 3. Counsel noted that U.S. Capitol Police Captain Jessica Baboulis previously testified that "no groups or member of the public were allowed within" the restricted perimeter. *Id.* at 4. In attempt to impeach Captain Baboulis, counsel sought to question her about how within (now) Exhibit 103, there is a single entry describing an alleged protest that constituted a "permitted event" on January 6. *Id.* The event was called "Donald, You're Fired March on DC" and claimed that a permitted march would "convene at the steps of the United States Capitol." *Id.* at 4-5. In other words, counsel in *Griffith* sought to show that there *was* in fact a lawful protest within the restricted perimeter. As noted by counsel at the time, "[i]f, in fact, the Capitol Police planned to allow a "permitted event" organized . . . to gather on the Capitol's steps . . . it would undermine the factual premise of the prosecution's charges." *Id.* at 7 (internal punctuation omitted).

The problem with the defendant's theory is both factual and legal in nature. To start, the defendant is correct that Exhibit 103 does indeed list a protest that is alleged to occur on January 6, 2021. It states:

**Current Permitted Events for this operational period:**

**Donald, You're Fired March on DC**
Location: U.S. Capitol to White House
Date: January 6, 2021
Time: 1200 – 1500 hours
Organizer: I Approve This Message
Attendance: Unknown
Description: On January 6th, 2021, at 12:00 p.m. Eastern Time, We, the People will convene at the steps of the United States Capitol to witness this momentous occasion. Upon the declaration the results of the 2020 elections, held on November 3rd, 2020, We the People will proceed, peacefully and safely, from the Capitol Building to the White House to deliver the message to Mr. Trump, "Donald, You're Fired!"

But as repeatedly explained and proffered during the *Griffith* litigation, Exhibit 103 was not intended to be gospel. Rather, the contents put the U.S. Capitol Police on notice of certain events that *may* be occurring – lawfully or unlawfully – on Capitol grounds. In *Griffith*, the government proffered that no groups were given demonstration permits for First Amendment assemblies within the restricted perimeter, a fact corroborated, under oath in *Egtvedt*, by the Lieutenant in charge of special permitting, Scott Grossi.[1] The government further proffered the abovementioned "march" was neither permitted nor approved to occur within the restricted perimeter. *See Griffith*, ECF No. 133, at 1 (explaining that the Capitol Police had determined that the source of the march was a website screengrab, not an actual application to protest, and that neither the U.S. Capitol Police, U.S. National Park Service, nor the Metropolitan Police Department had received a permit or authorized such a demonstration).

Indeed, in *Griffith*, the defense called the General Counsel of the U.S. Capitol Police, over government objection, to elicit no relevant testimony. The government has recently learned that, despite this, the defense has again subpoenaed the General Counsel for this case for the same apparent purpose. In fact, the defense has issued subpoenas to multiple members of the U.S. Capitol Police (including attorneys), without any proffer as to why their testimony may be relevant.

---

[1] The government made Lt. Grossi available for the defense in *Griffith*, but he was not called by the defense.

Thus, while the defendant is undeniably entitled to present his or her own case and does not have to accept the government's proffer at face value, the defendant's attempt to elicit evidence still must be grounded in relevant facts. Moreover, non-witnesses, such as random police officials or attorneys working for the U.S. Capitol Police should not be subjected to repeated legal process for the same line of inquiry, particularly when the defendant does not obtain the information he continues to seek. This leads to the second, more global problem with the defendant's proposed exhibits.

The defendant's series 100 exhibits appear to fundamentally misunderstand the concept of the restricted perimeter. Under the defendant's theory, if people *were* lawfully allowed in the restricted perimeter to protest on January 6, 2021, then the restricted perimeter would collapse in on itself. This is illogical. As Judge Kollar-Kotelly noted in *Griffith*, in denying a motion to dismiss based on the restricted perimeter, "assuming the Capitol Police designated the Capitol Grounds restricted, it works no unfair surprise on Defendant to convict him for knowingly entering or remaining in that area." *See Griffith*, ECF No. 119, at 7-8.

To start, the government has never alleged that *no one* was allowed within the restricted perimeter. To the contrary, hundreds of members of Congress, their families, staffers, and other Congressional employees were clearly permitted within the perimeter on that day, alongside law enforcement and other similar officials. Those individuals were lawfully permitted to be there. Moreover, even if there had been a permitted demonstration at the Capitol steps on January 6, which there was not, it would be irrelevant to the existence of the restricted perimeter for the purposes of 18 U.S.C. § 1752. That statute criminalizes the entry and presence within "any restricted building or grounds *without lawful authority* to do." 18 U.S.C. § 1752(a)(1). The statutory language itself recognizes the existence of a distinction between those with and without

lawful authority to enter into and/or remain within a restricted area. The fact that people *authorized* to enter or remain within a restricted area do *in fact* enter or remain within that area has no impact on whether or not it remains restricted for others who lack any such authorization.

At this juncture, there has been no proffer that the defendant knew about lawful protests occurring inside the restricted perimeter. While the government concedes that truthful knowledge of a protest within the restricted perimeter or an invitation to the same could factor into whether the defendant knowingly trespassed into a restricted area, no such evidence exists as to this nexus for this defendant. Absent some proffer that the defendant believed a lawful protest was occurring at the Capitol steps and thus believed he was authorized within the restricted perimeter, the repetitive inquiry into the existence of this purported demonstration appears to be a fishing expedition that is very likely to mislead or confuse the jury. Rather than focusing on the law and the facts adduced at trial, the jury will likely speculate as to whether a demonstration occurred within the restricted perimeter and its legal implications, without any evidence of such a demonstration. Moreover, such speculation could unintendedly misconstrue the law as it relates to the restricted perimeter. Lastly, this line of inquiry could needlessly prolong the presentation of evidence in this case, untethered to the defendant's actual knowledge, or the actual facts of what occurred on January 6, 2021. Instead, it appears to rest on some unfounded belief that U.S. Capitol Police is hiding some lawful demonstration within its restricted zone.

In the absence of a more fulsome proffer or direct evidence of how this inquiry matters, the government respectfully moves *in limine* for such exhibits' exclusion. It is worth noting that contours of whether the defendant unlawfully entered a restricted perimeter rests upon the facts of *this* case (rather than an examination of law enforcement's preparations). In this case, the defendant is alleged to have not only entered the perimeter unlawfully, but then entered the building, and

6

made his way to the Senate Chamber, where he stood upon the Senate dais – where the Vice President of the United States had stood, minutes earlier. While in the chamber, the defendant photographed documents pertaining to the Electoral College certification. After he left the scene, he gave an interview to a media site, acknowledging his illegal presence in the restricted area, stating (paraphrasing), *inter alia*, that:

- "By the time I got there, there were people already way up climbing scaffolding up there, climbing up the stairs. There wasn't even any barricades to keep us out . . . they were gone by the time I got there."

- "There's something going on here – this is a moment in U.S. history that like… it's not unlike the days of the beginning of the country. At some point there's enough illegal behavior . . . what are you supposed to do? Nobody in the courts will listen . . . at some point you reach a point and say how – none of my institutions are working – what am I supposed to do?"

- "My interactions with them [police] were, they were professional . . . and us, were mostly respectful, as respectful as you can be when you're kind of *pushing into somebody's space like that.*"

- "I feel. I'm kind of conflicted. You *violate* someone else's space – you force your way into a building in some ways that really feels wrong, but whose space is that? That really does belong to us. That should only be a last resort . . . maybe we shouldn't have done that . . . You come to the end of your rope . . . and you get swept up in a movement"

- "We took that chance and um, I that's … G-d will judge us for what we did and ya know . . ."

- "What are Americans supposed to do? No one will listen to us . . . well, hello? Can you hear me now?"

It is thus impossible to see how this inquiry is relevant to the defendant's knowledge of the perimeter in this case.

*The Remaining "Series 100" Exhibits*

While this motion primarily focuses on Exhibit 103, the remaining 100 series exhibits do not clarify this inquiry. A "schedule of events" (Exhibit 106-07)[2] or the "After Action Report" (Exhibit 104) appear untethered to the defendant's knowledge of what occurred at the U.S. Capitol on January 6. Moreover, such documents are inadmissible hearsay. For example, Exhibit 104 appears to be a report issued by the U.S. Capitol documenting various failures throughout the day on January 6. It is conceivable this report might be used for impeachment purposes, but unless its germane to a specific witness, the introduction of this exhibit appears to be an attempt to evaluate the U.S. Capitol Police on their rights and wrongs of the day. This is not relevant to this case.

Exhibit 101 – the authorized demonstration permits – suffer from the same nexus and knowledge problems as described above. While the government is prepared to stipulate as to their authenticity, the permits have nothing to do with what the defendant knew, saw, or experienced on January 6. Nor do the permits alter the legal landscape surrounding the definition or existence of a restricted perimeter.

With respect to Series 200 – 600, the government is currently reviewing each proposed defense exhibit. While we do not anticipate objections to most (if not all) exhibits, we respectfully reserve the right to object to inadmissible or irrelevant evidence, after careful review, and depending on the manner and purpose of which the defendant seeks to introduce the material.

---

[2] There does appear to be some limited communication about a Jericho March in the defendant's cell phone, but it appears to reference a protest on or about December 12, 2020.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:     */s/ Gregory Rosen*
GREGORY ROSEN
Assistant United States Attorney
VA Bar No. 82584
U.S. Attorney's Office
District of Columbia
601 D Street N.W.
Washington, D.C. 20530
Gregory.rosen@usdoj.gov
(202) 252-6932

*/s/ Ashley Akers*
ASHLEY AKERS
Trial Attorney