## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 21-CR-00708(RCL)** |
| **LEO KELLY,** | : | |
| | : | |
| **Defendant.** | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

Leo Kelly may be the nicest young man that was at the Capitol on January 6, 2021.  Despite being found guilty of obstruction of an official proceeding, he harbors no resentment. He only wants to make his community better and work towards healing a broken nation. This Court will never see Mr. Kelly on a TV show saying the opposite of what he says in Court like other defendants this Court has sentenced.

He came to DC from Iowa with his parents. He did what he came to DC for- attend a speech of the President, listen to speeches by other Christians and attend the Jericho March. Out of curiosity,[1] and a desire to see for himself as a witness from a Christian's perspective, he entered the Capitol at 2:43pm following crowds of others through opened doors.  He did not see how or who opened them, only that the crowd was freely entering inside.  He entered through the Senate Fire

---

[1] When Charlie Wilson saw Dan Rather on 60 minutes wearing a turban, Representative Wilson jumped  naked from a hot tub and said  to his friend "Paul, Dan Rather is wearing a turban. Don't you want to know why?"

Door.  Once inside, he kept another rioter from damaging property. He left at approx. 3:09pm.  All told, he was inside a total of 26 minutes.  Of those minutes he spent no more than 6 of them on the Senate Floor where he prayed, walked around and took several photos.  On the night of January 6, 2021, he gave an interview to a Christian News group called LifeSite news and it was videotaped. In it Mr. Kelly told the truth (imagine that!). He said when he woke up that morning he had no idea he was going in the Capitol, which was true. He also said in that interview that by the time he got to the Capitol there were no barricades to keep people out. Again true.  He even acknowledges in a moment of reflection that maybe he shouldn't have done that – gone inside.  What he doesn't say is what is most important.  He never says he was there to stop the vote, knew a vote was taking place or that he ever contemplated obstruction of the Electoral College Certification.  In fact, it was never established at trial that Mr. Kelly had the intent to interfere with the certification at all.  Moreover, a picture Mr. Kelly took while inside the Capitol, (figure 1 below, Defendant's Ex. 416) showed that he understood they had recessed for the day, making it impossible to have entered and remained there with an intent to stop something that had already been halted before

his arrival.



*Figure 1 - Defendant's ex. 416*

After the events of January 6th, Mr. Kelly truthfully cooperated with the FBI. In fact, he sought them out so he could turn himself in, another example of showing remorse from the very beginning. He gave an hour long interview to the FBI.  Again, he told the truth. Then he gave them his phone so they could search it. He never deleted any texts, emails, photographs- nothing. He never dreamed he would be charged with a felony and face prison time. Yet here he is, a non-violent, rule follower-someone the government will argue before this Court should go to federal prison. Yet lawyers, who work for the FBI, that lie on applications for

FISA warrants for political reasons, are not sentenced to prison-they get probation. *See USA v. Kevin Clinesmith*, 20-CR-165 (JEB).    Mr. Clinesmith walked out of a federal courtroom in this courthouse a free man.[2]

The defendant,  Leo Kelly, through his attorneys,  Kira Anne West, and Nicole Ann Cubbage, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), respectfully submit this memorandum to aid the Court at sentencing and hereby notifies the Court that he has received and reviewed the Final Presentence Report ("PSR") prepared in this case.  After carefully reviewing the PSR with Mr. Kelly, the defense filed the following objections. They are:

Paragraph 8 on page 5, "Only authorized people with appropriate identification are allowed access inside the US Capitol." This is false, Luke Mogelson of the New Yorker  and other journalists  were  allowed  on J6 without authorization or appropriate ID onto the Senate floor with no consequences.

Paragraph 15: Mr. Kelly never made his way "through barriers and police lines." Nor did he climb scaffolding. In fact, the opposite was proven at trial-all the barriers were down by the time Mr. Kelly arrived. He did not "hurt[y] inside the capital." This is blatantly false.

Paragraph 16: Mr. Kelly NEVER joined other rioters in a confrontation with police. This was not proven at trial. Mr. Kelly was in the area of the confrontation, but did not join anyone in any confrontation.  He was pushed up to the line of officers by others behind him but did not engage in confronting them.

Paragraph 17: The phrase "Senate material" was not defined.

Paragraph 18 & 19: Statements from Mr. Kelly are added, *infra*.

---

[2] Thus far, Mr. Kelly's only sin is that he did not walk into the Capital with an FBI badge.

After consultation with the government, the probation officer changed the facts listed in the PSR. The previous stated facts objected to in paragraph 15 were deleted, because they were false. The government then gave additional facts to the probation officer for the final PSR which are also patently false and meant to mislead this Court. Therefore, the defense objects to paragraph 15 of the final PSR. First, there was no testimony that Mr. Kelly was "hopeful" about anything. Second, Mr. Kelly never "announced I'm going to Washington, D.C…."  Mr. Kelly was responding to a text that came in five minutes before that statement that said to him; "you free this weekend? …next Wednesday or Thursday we could grab some food and chat."  In response to that text, Mr. Kelly said "I'm going to Washington, DC, #stop the steal." Third, Mr. Kelly never "told a friend he was going to 'stop the steal." Again, Mr. Kelly was responding to a text from his friend that asked Mr. Kelly "you in DC?" Mr. Kelly responded "Yep! Stop the steal! Gonna be wild tomorrow I suspect."  This is much different than what the government leads this Court to believe. The defendant objects to the government imposing a sinister motive to these texts that have no such intent attached and there is no way to infer such intent from the context.

Again, the defendant objects to the assumption that Mr. Kelly joined a confrontation with police. Mr. Kelly NEVER joined other rioters in a confrontation with police. This was not proven at trial. Mr. Kelly was in the area of the

confrontation, but the video clearly shows he did not join anyone in any confrontation. He was pushed up to the line of officers by others behind him but did not engage in confronting them.

For the reasons set forth herein, Mr. Kelly requests that this Honorable Court vary from the guideline range (as suggested in the PSR, see paragraphs 136- 137) and impose a sentence of a period time served along with a period of home confinement,[3] two years supervised release, 60 hours of community service and $2,000 restitution to account for:

1.  His lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach and his peaceful, non-destructive and non-violent behavior that day both outside and inside the Capitol building, and his sincere remorse in this regard;

2.  His lack of bragging or posting on social media about what happened January 6;

3.  His amazing commitment to his community, his family and his church; and

4.  His long history of a strong work ethic ( a paper route!) which has allowed him to be a productive and positive member of society.

---

[3] 18 U.S.C. 3582 provides that the imposition of a term of imprisonment is subject to the following limitation: "in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation.

## I.   **Background**

Mr. Kelly was arrested at his place of work without notice on the  MLK

holiday so he would have to spend the night in jail even though he previously

contacted law enforcement before this time to voluntarily turn himself in. Despite

these law enforcement shenanigans, he voluntarily spoke to the FBI when they

arrested him and gave a detailed statement of the offense in which he admitted that

he entered the U.S. Capitol building.  He walked in and out of the building alone,

he did not cause any damage, nor did he engage in any violence. He was not

encouraging others to protest, to commit violence or to act in any unlawful manner.

He prayed on the floor of the Senate and was only there for approximately 6

minutes.  Additionally, Mr. Kelly gave the FBI his phone and cooperated with

them before getting a lawyer. When this Court considers  and compares the

behavior of other J6 defendants the Court will find that  Mr. Kelly should not go to

the penitentiary.

## II.   **Media reports of stolen election**

After the presidential election, Donald Trump (hereinafter "Trump") and his

inner circle began spreading the word that the election was "stolen" from him by

Democrats and others.  According to news reports, this was a lie. He refused to

concede. Claims were made on media sources, as well as by the President himself,

that the election system had been corrupted and that the integrity of the election

should be questioned.   We know now that the former President will face criminal charges in this courthouse for this very conduct.

Mr. Kelly came from Iowa with his family to D.C. to attend the Trump Rally and peacefully attend the Jericho March after reading media reports. There is absolutely no evidence in this case to indicate he had plans to enter the Capitol or commit any violence that day.

Mr. Kelly  educated himself about the allegations and followed how they were being brought to the courts.   He tried to make sense of the legal filings and rulings, but not being a lawyer, Mr. Kelly was left to make sense of the complicated election fraud cases on his own.     So when he heard about the rally at the Ellipse, he was interested in attending, not only to hear what President Trump had to say, but also to show his desire to protest the lack of election integrity.  He supported Trump and he felt that America was on a better path with Trump as president, but more importantly he supported truth, even if that truth meant Trump had lost.  Mr. Kelly wanted the process to be fair and transparent and felt the people were not being listened to by their members of Congress. Most importantly, he thought that the only way to effectuate change would be to pray for our country. There is no crime in this.

Mr. Kelly and his family, and a number of other people, went to the Capitol after Trump's speech to participate in a well-advertised and well documented event

called the Jericho March.  A similar Jericho March had happened before in late 2020 in DC prior to January 6th.  Mr. Kelly was aware of that prior march and text messages were on his phone with information regarding that event.  Another Jericho March was scheduled to happen at the Capitol on January 6th a noon.



*Figure 2*

This court heard testimony of the intention of the Kelly family to attend this march and how they arrived at the grounds of the Capitol that day looking for the organizers, fearful that they might be late because President Trump's speech had been delayed.   Mr. Kelly had no idea when he arrived to the Capitol Grounds at approximately 2pm that over an hour before, at approximately 12:53pm, others had

overrun a line of officers, broken down the barricades that closed off the west side of the Capitol grounds and carried away any signs that the area had been restricted. It was proven at trial that when he arrived on the grounds there were no signs or barricades to stop his entrance or warn him that entering the grounds was unlawful. There was a sea of people and an unencumbered pathway up to the upper west terrace.  He did not suit up for combat.  He did not obscure his face.  He was not armed.  He wore street clothing. He did not carry anything.  He came with his family to attend the Jericho March,  not as part of an organized group.  He committed no violent actions in his walk through the Capitol.   He did not destroy anything. His only desire was to see what was taking place and witness and have his voice heard in prayer for our country.

III.    **THE TRIP TO THE CAPITOL AND JANUARY 6, 2021**

### A.  **Mr. Kelly's trip to D.C. and his walk to the Capitol**

Mr. Kelly believed what he read on the internet and heard from the President himself - that the election had been stolen.   He believed that there was wrongdoing in the State of Georgia as the President repeatedly told his followers.  He also believed that he should show his support for the soon to be former President by attending his rally scheduled for January 6, 2021, at the Ellipse on the Mall.  Now, Mr. Kelly is very upset that people died that day, that people destroyed certain

areas of the Capitol, and that police officers were attacked by the crowd.   He only learned how horrible the day was  days after the fact.  His concern for all those that died is sincere, and as he walked to the Capitol, he had no idea that the result would be what it was.

    **B.**   **Mr. Kelly's activities inside and outside the Capitol.**

For some time, police were able to fend off the crowd, but as we now know, some rioters instigated a push to overwhelm the few, undertrained, under equipped and unprepared police.[4]  By 1pm the barricades had been totally breached and destroyed.  Thereafter, protestors made their way up the on to the Upper West Terrace and at approx..2:13 p.m., the Capitol was breached through a broken window adjacent to the Senate Wing Doors. This breach was well before Mr. Kelly actually entered the Capitol and at approximately the time he would have just reached the Capitol Grounds down by the Peace Circle.  He didn't see the breach or even know it was occurring.

By the time he made his way up to the upper terrace of the west side of the Capitol, there was no fighting or police interaction to be seen.  No officers were outside in the courtyard at this time and the people were standing around waving

---

[4] See Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the Capitol, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

flags and peacefully signing and chanting.    The Senate Wing Doors are not visible at the distance in figure 3 below as they are obscured by arches of brick. Importantly, on January 6th, there were no signs or barricades to tell Mr. Kelly and others that they could not be in that area.  In fact, there was an elevated ramp adjacent to the senate wing doors leading people up to the senate wing doors as if to line them up for entry.



*Figure 3*

Mr. Kelly entered through the Senate Fire Door shown to the left of the courtyard in figure 3 above, not the Senate Wing Doors.  Once he ascended the stairs he was able to enter through the open doors not knowing who opened them. He walked down the hallway and then turned into an open door to his right (The Parliamentarian's Office) where people were filing in ahead of him.   He filmed

with his phone while inside.  He was upset with the mess he encountered and went

out of his way to tell another protestor not to destroy things saying " Knock it off ."

He stayed only a few seconds in that room, but was charged with an entirely

separate crime for merely entering.  He then exited out the same door he entered

and followed the crowd down the hallway.  Once at the end of the hallway, Mr.

Kelly took a picture of a water bottle with orange peels inside.  It seems like a

strange thing to focus on, but to Mr. Kelly the situation was not so violent or

unruly that he couldn't stop to see that little detail.  He was observing rather than

participating in the chaos.  When the crowd pushed him up towards the officers, he

looked past them and saw people walking freely.  It seemed like a much better

place to be than at the front of the crowd that was yelling and pushing.  So when

the opportunity presented itself for him to proceed forward, he did.  Mr. Kelly then

followed the crowd up the staircase and into the Senate foyer where he looked

around, took some photos, prayed and left.  As he left, he passed six officers.  Not

one told him to leave or said a word to him. (See figure 4).



*Figure 4*

The testimony at trial established that the officers never told him to leave the area or that he was trespassing.   This gave Mr. Kelly the belief that the officers had deemed it permissible for protestors to be there.  Indeed, even on the Senate floor Officer Robishaw stood there as Mr. Kelly and others entered and didn't say a word.  He watched silently while they prayed and wandered around. Robishaw testified that he actually led some protestors, including Jacob Chansley, from the upstairs hallway down to the Senate Floor in an attempt to influence others to leave.  How Robishaw intended to execute that half-baked plan is a mystery.  What he did do, through his mere presence and silence, was to send the message to those entering the Chamber that law enforcement officers were permitting them to enter

and remain with law enforcement consent. (See Figure 5).



*Figure 5*

## C. **Hindsight is 20/20.**

Mr. Kelly has absolutely no history of political extremism.  He had absolutely no expectation or knowledge of the consequences of others' actions that day, nor the consequences that their actions would have on his being present.  He was supporting the President in what he understood to be the President's legitimate efforts to claim victory in the Presidential election.

While he did not personally destroy anything, the jury found that he illegally played a part in a mob.  According to Ed Maguire, a criminologist at Arizona State University, security forces are trained to ignore yelled insults and small acts of hostility, like pushes and thrown water bottles. And they receive training in

absorbing surges in a crowd, moving people as gently as possible, and quickly responding to pockets of violence and isolating agitators.  Benedict Carey, <u>Making Sense of the 'Mob' Mentality</u>, New York Times (Jan. 12, 2021), available at https://www.nytimes.com/2021/01/12/science/crowds-mob-psychology.html  Mr. Kelly  did not commit any of those actions towards police.  On January 6 there was "[n]o clear structure in the crowd and absolute chaos on the police side: no clear sense of credible incident command, of wearing the right gear, carrying the right weapons. All of that seemed to be missing." <u>Id.</u>

Importantly, as for persons in the mob "With no apparent structure or strategy, the crowd had no shared goal or common plan." <u>Id</u>.  Dr. James Jasper, a sociologist at City University of New York, noted, "Crowds do not act with one irrational mind… There are many groups, doing different things, for different reasons."  He further said, "There are great shots from the hall of statues, where protesters stayed inside the velvet ropes, like tourists, looking around sort of in awe." <u>Id</u>.

Unfortunately, Mr. Kelly followed a large crowd  rather than leave; not knowing  how violent as a whole the mob would be independently of his own actions. Others who were also part of the mob, had different and more violent plans that day of which Mr. Kelly is now being associated with.

**IV.  LEGAL STANDARD**

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense.   Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets forth the factors that the Court must consider in fulfilling this provision.[5]

## V.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a).    *United*

---

[5] 1.   The nature and circumstances of the offense and the history and characteristics of the defendant;
2.   The need for the sentence imposed;
3.    The kinds of sentences available;
4.   The kinds of sentence and the sentencing range…;
5.    Any pertinent policy statements issued by the Sentencing Commission;
6.   The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.   The need to provide restitution to any victims of the offense.
18 U.S.C. § 3553(a)(1-7).

*States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough*

*v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

**A. Nature & circumstances of the Offense & the History and Characteristics of Mr. Kelly**

As the attached letters indicate, Mr. Kelly is loyal, kind, generous and law abiding. *See* Exhibit 1, letters.[6] First, the defense is not aware of any evidence that defendant's entry into the Capitol was violent in any way.  Second, there is no evidence that he engaged in any violence or questionable conduct towards law enforcement.  Third, he did not destroy or steal any property from the Capitol.  Fourth, based on the Government's investigation, it appears that he remained in the Capitol building for about a 1/2 hour.

The government must concede that he committed no violent acts and destroyed no property, even though he was in the proximity of others committing violence. His actions within the Capitol have been tracked on the CCTV footage and this footage demonstrates that he did not destroy property or commit violent acts.  He did not suit up for combat.  He did not obscure his face.  He was not armed.  He did not yell at any police officers. He wore everyday clothing.  By the time Mr. Kelly arrived at the U.S. Capitol, the barriers that had been erected along the perimeter of the building were no longer present. This was shown at trial.  He

---

[6] The volume of letters is so enormous that they will be filed tomorrow, August 12, 2023.

met no resistance in his walk to and inside the Capitol. At the time, he didn't

dream he'd be charged for going into the Capitol.[7]

He spoke to the officers and the FBI truthfully, freely and voluntarily when

arrested. Without representation of counsel, he fully acknowledged his conduct by

answering pointed questions by multiple FBI agents. He has never violated his

conditions of release.    He did not post anything on social media or brag to friends

after January 6.

This has obviously been a tough road for Mr. Kelly and his family.   He has a

very simple life: he works hard and tries at every turn to improve himself, support

his family, and be a servant of God.  It is of utmost importance to him that this Court

understand that he is incredibly saddened about what took place on January 6, 2021.

None of his actions will be erased from the internet. It's there forever.  He has been

the subject of a number of media accounts lumping him with others that were there

on January 6, 2021 for violent purposes. His personal character and reputation will

forever be tarnished.  In sum, he has been punished already by his actions.

He does not seek to minimize the harm caused by his behavior by the

explanations in this sentence memo.  In determining what punishment is warranted,

this Court should not lose sight of the fact that he did no harm, intended no harm,

and has lived a life with very little criminal conduct.  His past behavior and his

---

[7] Mr. Kelly's letter to the Court will also be filed tomorrow, August 12, 2023.

post arrest behavior show that he is capable of being a very law abiding, productive citizen and the Court can rely on that as a basis to sentence  him  to a term of  time served, house arrest and supervised release  considering the 3553 factors.

## B. Need for the Sentence imposed

1. **General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct**

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  He has already been severely punished as noted *supra*.  The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a person unable to work when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to  be counterproductive, and labeled as political posturing.  A sentence of  time served, home detention and probation does constitute punishment  and  it will deter others as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's

personal freedoms. He has been on pretrial release for over two 1/2 years  with

many restrictions and has complied with them completely.  The National Institute

of Justice, Department of Justice, issued a summary of the current state of

empirical research stating that "prison sentences are unlikely to deter future

crime," and "increasing the severity of punishment does little to deter crime."  U.S.

Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to*

*Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, *Deterrence in the*

*Twenty-First Century*, 42 Crime & Justice in America 199 (2013)), available at

https://ncjrs.gov/pdffiles1/njj/247350.pdf.

## 2.  Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant

 Mr. Kelly's  likelihood of recidivism is really non-existent. He has

expressed genuine remorse and contrition.  His acceptance of responsibility was

swift, complete and without reservation and exercising one's constitutional right to

go to trial should not be used against him.  Research has consistently shown that

while the certainty of being caught and punished has a deterrent effect, "increases

in severity of punishments do not yield significant (if any) marginal deterrent

effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just.

1, 28 (2006)" Three National Academy of Science panels… reached that

conclusion, as has every major survey of evidence." *Id*.; *See also* Zvi D. Gabbay,

*Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. Given his  current age  and other issues consistent with what is mentioned above, the likelihood that he would ever re-offend is as close to zero as one might come.[8] A punishment of any jail time in this case is going to have the exact opposite effect than what is in the interest of justice. The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice.  Mr. Kelly urges the Court to impose a sentence of  time served and

---

[8] For defendants in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* (May 2004).

home detention in  this case in light of his non-violent conduct at the Capitol, his
cooperation with the FBI, and the lack of a need to further deter him.

### 3. Just Punishment

Particularly during this alleged "post-pandemic," it is best for the
community, as well as for Mr. Kelly, that he continue his service to the
community outside of prison.  He has a felony conviction which, in and of
itself, is quite punitive.  The conviction  affects possible future job opportunities
and will remain with him for the rest of his life.  He can't vote or carry a gun.
But home confinement and supervised release will allow him to continue to
work and support his community and continue the volunteering he does in his
church.  If incarcerated, the family business would be in peril.

Given sentences imposed in comparative cases, a sentence of  time served
and home detention and supervised release is not unusual for some felony cases
and is  appropriate here. *See* Disparity section, *infra*.

Home detention involves significant restraints on a defendant's liberty.
Defendants must periodically report to the probation officer, permit the officer
to visit their homes and jobs at any time, and follow the officer's advice. *Jones
v. Cunningham,* 371 US 236, 242 (1963).  Defendants are admonished to keep
good company and good hours, work regularly, keep away from undesirable
places, and live clean, honest, and temperate lives. *Ibid*.  Not only must they

faithfully obey these restrictions and conditions, but they also live in constant fear that a single deviation, however slight, might result in being sent to prison. *Ibid*.

Defendants might be rearrested any time the probation officer only believes they have violated a term or condition of probation. *Ibid*. They might have to serve all of the time that was suspended with few, if any, of the procedural safeguards that normally must be provided to those charged with crime. *Ibid*. Probation significantly restrains defendants' liberty to do the things that free people in this country are entitled to do. *Ibid*.

**B. <u>The kinds of sentences available</u>**

A sentence of   incarceration would result in sentencing disparity with other individuals who behaved similarly but were not similarly charged . *<u>See infra</u>*.

Imposition of a fine is discretionary, and, defendant respectfully submits, he can pay a fine in this case.

**C. <u>The need to avoid unwarranted sentence disparities</u>**

If this Court were to impose a sentence greater than home confinement, supervised release, community service, a fine and/or restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing  or are pending in this Court. Many defendants with much worse

conduct were allowed to plead to class A & B misdemeanors.[9]  Paragraph 137 of

the PSR states that the median sentence of J6 defendants convicted of a 1512

---

[9] The following cases are a sampling where a **class B misdemeanor** was charged
and pled to and resulted in little to no incarceration with facts that were more
egregious than Mr. Kelly's:

**United States v. Jessica Bustle and Joshua Bustle,* 21-cr-00238 (TFH), ECF
Nos. 42 & 44 (sentenced to supervised release with home confinement even though
Ms. Bustle 1) posted on social media that Mike Pence was a traitor, 2) denied
media accounts of violence were accurate, minimized the conduct of all of the
rioters, 3) called for a revolution even after the events of January 6, 4) encouraged
the rioters to be proud of their actions, and 5) minimized the impact of that day on
lawmakers and democracy. Judge Hogan imposed a probationary sentence with a
short period of home confinement for Ms. Bustle and an even shorter period of
home confinement for Mr. Bustle. The government recommended probation in this
case.

**United States v. Andrew Bennett,* Crim. No. 21-227 (JEB)(sentenced to three
months home confinement and two years' probation). According to the
government, who recommended probation with a short term of home confinement*,
Mr. Bennett espoused conspiracy theories about the election, was an admirer,
albeit not a member of the Proud Boys, and boasted about his conduct. According
to the government, Mr. Bennett did not come to the rally in D.C. on a whim, but
rather planned it for months. He posted numerous times about conspiracy theories
and a fraudulent election. On January 4, 2021, he posted to his Facebook page,
"You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for
my freedom!". On January 6, according to the government, Bennet began
livestreaming video to his Facebook page from outside the Capitol as early as 1:00
p.m. He was in the middle of the growing crowd on the West Front of the Capitol,
where some taunted police officers and sporadically threw objects at them. The
government alleges that someone near Bennett exhorted others to "move forward"
and that Bennett yelled at a police officer. Bennett also filmed assaults on the
police officers and continued to livestream events inside the building.[9]

 **United States v. Weisbecker*, 21 CR 682(TFH) Judge Hogan ordered 30 days of
intermittent confinement as a condition of 24 months' probation.  Mr.
Weisbecker's conduct and treatment towards law enforcement was much more
severe than the instant case. He entered the Speaker's suite of offices, he posted
multiple videos and photos on Facebook and other media cites for days,  and

———————————

repeatedly berated federal border patrol officer at checkpoints multiple times. The language is so bad it can't be repeated.

\*\*\**United States v. Carlton*, 21 CR 247 (TFH), Judge Hogan sentenced the defendant to 36 months' probation. As the government pointed out in their sentence memo, Mr. Carlton: (1) made two separate entries into the Capitol; (2) chose to enter the Capitol Building after watching rioters climb the scaffolding, smelling tear gas, and seeing billows of smoke rise around him and from the Lower West Terrace, where rioters were clashing with law enforcement; (3) initially lied to law enforcement officials about his activity on January 6, 2021; (4) admitted he "may have" deleted some texts related to January 6; (5) filmed the chaos around him rather than choosing to leave; (6) has not expressed since remorse for his crimes on January 6, and (7) as a corrections officer, Carlton should have recognized the dangers that he and his fellow rioters' presence at the Capitol posed to public safety. *See  Gov't sent. Memo,* ECF No. 47, p. 2. Mr. Wood engaged in none of this conduct.

\*\* *United States v. Reeder,* 21 CR 166 (TFH). Critically, this J6 defendant pushed police officers and made contact with them yet the government chose not to pursue those charges and he was given 3 months incarceration and allowed to keep his class B misdemeanor deal. Here's what he posted: "was there for over a half hour. I got gassed several times inside, many times outside the Capitol. Got shot with peppers balls. Its fucking nuts. We had to battle the police inside. It was crazy. Absolutely insane." *See* ECF No. 26, p.1. Later a group unaffiliated with the government brought to their attention additional violent conduct by Mr. Reeder, and the government asked to continue the sentencing hearing. Ultimately, despite concrete evidence of violence, the government chose not to bring additional charges. *See* ECF No. 33; 35, exhibit 1, power point, pages 30-41.

In *United States v. Youngers*, 21 CR 640 (TFH), Judge Hogan again gave a probationary sentence despite that defendant's conduct as outlined by the government:

Aware that he was facing arrest, Youngers scaled a wall to reach the Capitol Building, filmed a confrontation between rioters and police, and entered through the Senate Wing Door within ten minutes of the initial breach. After filming himself declaring "this is what a revolution motherfucking looks like," and collecting a souvenir piece of broken glass, he and codefendant George Tenney proceeded to the Rotunda Doors, which had not yet been breached. Tenney opened the door for rioters, instigating the breach of the Capitol from the east side. Youngers tried to open one of the doors too, encouraged entering rioters, and swatted at a police officer, but then took some steps to assist the now-outnumbered police, untangling an officer's radio from a bench and temporarily keeping some

offense is 21 months. But this is merely a box score.[10] As this Court knows, each case must stand on its own facts. The following 1512 cases are the closest to Mr. Kelly's conduct, yet the conduct is much worse than Mr. Kelly's and the sentences much lower that the Guidelines here:

**1.*USA v. Brian Gundersen*,** 21-137 (RC).  This defendant went to trial in front of Judge Hogan and was found guilty of 1512 and other counts. He was sentenced to 18 months. The government asked for 46 months. Here are the facts of his case:

He entered the capitol twice. He first lied to the FBI and told them he didn't go into the capitol. Prosecutors said Gundersen showed no remorse after the riot. In the days after Jan. 6, Gundersen made several social media posts about the events at the Capitol. He posted a picture of members of Congress taking cover during the insurrection and wrote "Look at these scared little bitches," called the rioters "patriots" who were "mad enough to attack the government," and wrote "we can check bum rush the capitol building off the list of potential ways to take over the government."

---

rioters away from that officer. Before leaving the area, Youngers filmed another video celebrating the breach of the Capitol. Back at a hotel, he filmed a video denying that there was violence at the Capitol and gave an interview wearing a full-face mask to conceal his identity.
*See* ECF No. 55, Gov't sent. memo at p. 2.
Read more at: https://www.kansascity.com/news/politics-government/article268291057.html#storylink=cpy

[10] A box score states what happened, not how or why.  For example, a QB throws 4 td's in a game. But it doesn't show the 3 interceptions that were dropped by the defense nor does it show how the touchdowns were completed. There's a big difference between a 60 yard bomb with two defenders and a QB dumping it off to the running back who runs it in for 80 yards. You have to watch the game to know what happened. If you watch the game, you have a completely different conclusion. Without having the facts and circumstances of all these statistics, undersigned counsel believes the 1512 counts also had 111 felony convictions as well which skews the median up to 21 months.

On Jan. 8, he posted "We all stormed the us capital [sic] and tried to take over the government. We failed but fuck it." Later in the day he wrote "Just was at our capital (sic) building in a massive event that rocked the world."

He then watched others ransack the parliamentarian's office for about eight minutes and left a mocking note that read "sowwy for damage," with a crying emoticon.

**2.** *USA v. Anthony Puma*, 21 CR 454 (PLF)  The defendant plead to a 1512 count

and was sentenced to 9 months. Government asked for 18 months. Here are the

facts:

After entering the Capitol's restricted area, Puma approached a wall on the Capitol's west side and urged other rioters in front of him to move forward and clear the way for others attempting to scale the wall. Puma then scaled a different wall on the north side of the Capitol and, from there, reached the Capitol's Upper West Terrace.  As Puma approached the Capitol's West Front on the Senate side, he told other rioters in the mob that he was going to ignore the curfew, stating, "I just scaled that [expletive] wall." He also said, "They probably evacuated everybody already here."

Minutes later, Puma entered the Capitol building through a shattered window near the Senate Wing Door. Puma then marched through a corridor toward the Crypt of the Capitol. Along the way, Puma entered a Senator's office, where other rioters were smoking marijuana. Puma asked if he could join them. Puma next took another detour, this time to enter another Congressional room where other rioters were congregating.

After exiting the Capitol building, Puma began livestreaming videos from his cell phone on social media.  In one video, Puma boasted: "We got tear gassed. Now we just tried storming it again, and we got pepper sprayed." **Puma then remained on Capitol grounds even as officers kept pushing the rioters further and further back**. On January 10, 2021, Puma issued an ominous warning to a friend on Facebook, "Watch what is to come in the next two weeks to month. It will shock the world."

*3.USA v. Richard Michetti*: 21 CR 232 (CRC) Government asked for 18 months

and he got 9 months. He pled guilty to a 1512 count. Here are the facts:

"He personally **confronted police and encouraged other rioters who were
assaulting officers in the Old Senate Chamber hallway."**  "Michetti was
sprayed .twice with irritant and twice remained in the Capitol building despite the
clear efforts of police to force him and other rioters to leave." He texted an
individual that "it's going down here we stormed the building they held us back
with spray and teargas and paintballs." Three minutes later, he sent another text to
the same person, saying "Gotta stop the vote it's fraud this is our country."

He was in a crowd trying to get past a line of Metropolitan Police Department
officers attempting to secure the hallway by the Old Senate Chamber. He remained
near the front of the crowd, yelling at the officers and at one point pinching the
sleeve of an officer trying to keep the mob from penetrating further into the
building. He and others in the crowd then dispersed into the Rotunda, where he
yelled at officers, "you are starting a civil war."

*USA v. Matt Wood,* 21-233 (APM) He plead guilty to 1512 and other counts. The
government asked for 57 months and he was sentenced to 0 days and 1 year home
confinement. Here are the facts:Mr. Wood texted  to friends "we bravehearted that
bitch." He bragged about being violent but the video showed he was not violent.
He was in the Capitol more than an hour with many opportunities to exit that he
didn't take. **He confronted officers and shouted at them in the Rotunda**.

Other 1512 convictions with conduct similar to Mr. Kelly where the

defendants plead guilty are: *USA v. Stotlmeyer,* 21 CR 334 (TJK) where he

received 9 months not 18 months that the government asked for; *USA v. Thomas

Adams*, 21-354 (APM), He received 14 months not 34 months the government

asked for. In *USA v. Troy Sargeant*, 21cr258( TFH), the defendant pleaded guilty

to assaulting a police officer. The government asked for 27 months and Judge

Hogan gave him 14 months. Thus, Mr. Kelly's guidelines overrepresent his actual behavior.

Here are examples where a defendant pled to a **class A misdemeanor** charge with much worse conduct than Mr. Kelly:

**United States v. Jenny Louise Cudd*, 21-cr-00068 (TFM) (sentenced to 2 months probation)(defendant wore a bullet proof sweatshirt, engaged in a push against law enforcement officers while yell "go" and "charge" and celebrated property destruction and lacked remorse) *See* ECF 90.

**United States v. Jennifer Ryan* 21-cr-00050(CRC)(sentenced to 2 months incarceration)(the defendant posted and live streamed her activity; she was "publicly cheerleading on a violent attack"(See ECF 48); she said the events were "a prelude to war" she shouted "fight for Trump" and "Hang Mike Pence"; she tweeted a photograph of a broken window that encouraged additional violence and she had no remorse;

**United States v. Scirica*, 21-cr-000457 (CRC) (sentenced to 15 days incarceration). Here, remarkably, the defense agreed with the government's 15 day recommendation of incarceration. The defendant was not remorseful, close to chamber where vote took place, close to police line, chanted USA at police, and directed the crowd inside the capitol. He also took photos and video of himself. See ECF 17.

**United States v.  Courtright*, 21-cr-00072 (CRC) (sentenced to 30 days incarceration)(the defendant went onto the Senate floor; picked up a "members only" sign and only returned it because an officer ordered her to; posted on social media that showed a complete lack of remorse; and chanted at a line of police officers "whose house, our house and USA, USA.").

Consider also the sentence imposed in *United States v. Mark Leffingwell*, 21-cr-5-ABJ (D.D.C. 2021). Leffingwell entered the Capitol Building. *Id.,* ECF No. 31, p. 2. But "Leffingwell was not content to merely stand inside the threshold":

Positioned at the front of the line of rioters stacked hundreds deep behind him,

Leffingwell chanted at the officers standing before him to "join us!" in the rioters' efforts to assault the Capitol. When some in the crowd shouted for the rest of the crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll never get back in!" When U.S. Capitol Police Officers D.A and W.H tried to repel Leffingwell and the gathering crowd, Leffingwell struck both officers in the head. *Id.,* p. 2 (emphasis added). Specifically, Leffingwell "first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more." *Id.,* p. 8. His conduct was so brazen that he was one of the few protesters arrested on the scene. *Id.,* p. 9. Leffingwell pled guilty to a felony offense under § 111(a)(1). *Id.* The government sought a sentence of 27 months' incarceration. Id., p. 2. The Court imposed a sentence of six months' incarceration with credit for time served, followed by 24 months of supervised release. Mr. Kelly's conduct was nowhere near this.

Consider *United States v. David Blair*, 21-cr-186-CRC (D.D.C. 2021). Carrying a Confederate flag, Blair walked up to a police line outside the Capitol. He turned towards an officer and said, "What's up motherfucker, what's up, what's up bitch?" 21-cr-186, ECF No. 55, p. 8. When the officer came close to Blair, the defendant jabbed him with a lacrosse stick. *Id.* A search incident to arrest recovered a knife in the defendant's backpack. 21-cr-186, ECF No. 55, p. 8. Blair pled guilty to a § 231(a)(3) felony offense. This defendant was sentenced to five

months' incarceration. Just as in *Leffingwell,* Blair's acts could only be interpreted as intended to inflict bodily injury or to threaten it.

All told, the facts of the offense conduct and characteristics of the defendants who garnered little or no incarceration  and were charged with only misdemeanors were starkly different than Mr. Kelly's conduct and characteristics. His  culpability appears to be minimal in contrast with rioters who posted hateful messages, destroyed or stole government property and assaulted or threatened the law enforcement officers on that date.  While Mr. Kelly accepts  complete responsibility for his actions, he was guided and urged every step of the way by no less of an authority than the former President of the United States and a majority of Republican Senators and Congressman that continued to state that the election had been stolen by the Democrats.

## VI. CONCLUSION

Considering all the applicable factors the Court will consider,  Mr. Kelly respectfully moves this court to impose a sentence of  time served, a period of home confinement, 24 month's supervised release, 60 hours of community service, and $2,000 restitution.  This sentence  is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a).  It would be a sentence in the best tradition of federal judicial discretion, that would consider Mr. Kelly as an individual and account for his unique failings and positive attributes that, in the words of Justice

Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment

to ensue." *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing*

*Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,

By:   _____/s/   *Kira A. West*_____

Kira Anne West
DC Bar No. 993523
712 H. St. N.E., Unit #509
Washington, D.C. 20005
Phone: 202-236-2042
kiraannewest@gmail.com

/s/   **Nicole Cubbage**

Nicole Cubbage
DC Bar No. 999203
712 H. Street N.E., Unit #570
Washington, D.C.  20002
703-209-4546
cubbagelaw@gmail.com

Attorneys for Leo Kelly

<u>CERTIFICATE OF SERVICE</u>

I hereby certify on the 11th  day of August, 2023 a copy of same was

delivered to the parties of record pursuant to the  rules of the Clerk of Court.

_____*Kira West*_____ /S/

Kira Anne West