**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-708** |
| **LEO CHRISTOPHER KELLY,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Leo Christopher Kelly to 27 months' imprisonment, 36 months of supervised release, $2,000 in restitution, and a mandatory $190 special assessment (consisting of the mandatory assessments of $100 for his felony conviction (Count One), $25 for each Class A misdemeanor conviction (Counts Two and Three), and $10 for each Class B misdemeanor conviction (Counts Four, Five, Six, and Seven)). The requested 27-month prison sentence represents the midpoint of the government's Sentencing Guidelines' calculation for Kelly, which is 24 to 30 months of imprisonment.

## I.    INTRODUCTION

The defendant, Leo Christopher Kelly, was one of the very few rioters who breached the Senate Chamber and ascended the Dais during his participation in the January 6, 2021 attack on the United States Capitol. That violent attack forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million

1

dollars in losses.[1]

Following a jury trial, Kelly was found guilty on all counts. The government recommends that the Court sentence Kelly to 27 months' incarceration, which is within the advisory Guidelines' range of 24-30 months, and which the government submits is the correct Guidelines calculation.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the Affidavit accompanying the complaint filed in this case, ECF No. 1-1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Leo Kelly's Role in the January 6, 2021 Attack on the Capitol

Kelly lives in Cedar Rapids, Iowa and works as the Vice President of Finance at a wireless internet company. Trial Tr. 5/5/23 at 28. After the presidential election in 2020, Kelly began to vocalize his dissatisfaction with the results of the election and express his opinion that the election had been "stolen." Kelly followed numerous lawsuits challenging the results of the election, *e.g.*, Trial Ex. 604.1 at 1-2, 3, 7, 9, 12, and claimed that the election had been littered with "illegal activities," *id.* at 4. After the election results were announced, Kelly told a friend that "Joe Biden

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

was not elected president," and he warned that "[n]othing can stop what is coming." Trial Ex. 604.1 at 4, 8. As January 6 neared, Kelly discussed with a friend the Supreme Court's rejection of a lawsuit seeking to overturn the election results. Kelly remained hopeful; he declared, "It's not over. It may get a lot messier but it's not over."

By the end of the December 2020, Kelly decided to take action. He announced, "I'm going to Washington DC, #stopthesteal!" *Id.* at 14. Then, on January 5, 2021, Kelly told a friend that he was going to "Stop the steal!" and said that he suspected January 6 was "[g]onna be wild." *Id.* at 16.

On January 5, 2021, Kelly traveled to Washington, D.C. from his home in Iowa. He drove by himself but coordinated and planned to meet his parents upon arrival. On January 6, 2021, the defendant joined a large group of people, including his parents, at the former president's "Stop the Steal" rally. After listening to the former president's speech, Trial Tr. 5/5/23 at 220-221, Kelly and his parents marched towards the Capitol building. As Kelly approached the Capitol building, rioters were climbing on statutes and construction scaffolding outside the building, area closed signs were erected on fencing, and rioters were flooding the Capitol grounds. Trial Exs. 103.1, 105, 403 at :18. Kelly's father, who walked next to him, testified at trial that "people were everywhere" and there was "craziness going on." Trial Tr. 5/5/23 at 211. One rioter nearby even said, "don't let your children go up there," referring to the Capitol building. *Id.* Kelly's parents decided not to progress to the Capitol because of the surrounding "chaos," but Kelly continued towards the Capitol anyway. Trial Tr. 5/5/23 at 224.

Kelly eventually made his way through the mob of rioters, past the barriers, and beyond the lower west front, and approached the west terrace courtyard. As he approached, chaos reigned.

Rioters had recently broken into the Senate Wing Door and flooded into the building. Trial Tr. 5/3/23 at 81-82. Some rioters were leaving the building with the effects of chemical irritant still visible on their faces. Other rioters stood near Kelly by the Senate Wing Door wearing tactical gear such as helmets, vests, and gas masks, and carrying weapons like a baseball bat. Trial Exs. 104, 402, 405, 406. Kelly used his phone to video record the scene. His footage showed shattered glass windows, rioters screaming, and police in riot gear guarding the inside of the Capitol. *Id.*

Around that same time, a rioter began violently bashing in the Parliamentarian's Door, which was just across the courtyard from Kelly. Trial Exs. 301-304; Trial Tr. 5/3/23 at 81. After the rioter bashed in the window with a metal pole and stuck his arm through the door to release the door and open it for the mob, rioters rushed into the building, Kelly included. Trial Exs. 301-304, 701, 702; Trial Tr. 5/4/23 at 15-17, 24 (rioters were "relentless on getting past us to get inside the building").

Kelly entered the Capitol building through the Parliamentarian's door at approximately 2:43 p.m. Trial Ex. 204. As he entered, the building was loud; sirens were blaring, rioters were yelling and screaming, and rioters were intent on destruction. Immediately upon entering the building, Kelly watched as another rioter used a metal stand to bash in an office door. *Id.* Across the hallway, rioters had already breached the Parliamentarian's Office. Kelly entered that office for a short time, walked out of the office and down the hallway a few more steps, and again entered the Parliamentarian's Office through a second door. Trial Ex. 205. As Kelly entered the office, he took a video on his phone, which revealed that the office was visibly trashed after it had been ransacked by other rioters. Trial Ex. 408. Papers, trash, and personal items littered the floor. Trial Ex. 309. Former General Counsel to the Secretary of the United States Senate Daniel Schwager

4

testified at trial that he entered the Parliamentarian's Office after the rioters had ransacked it, and he was "distraught at the condition." Trial Tr. 5/3/23 at 199. Kelly exited that office and rejoined the rioters in the hallway facing off with officers.

At this time, a vastly outnumbered line of officers attempted to keep the rioters back. Trial Ex. 408. One rioter attempted to charge forward and breach the line, and the officers captured and attempted to detain that rioter. Trial Tr. 5/4/23 at 25-27. Kelly video recorded the attempted arrest using his cell phone. Trial Ex. 409.



*Figures 1 & 2: Screenshots of Trial Ex. 409, a video that Kelly recorded, showing officers attempting to arrest a rioter who charged the police line near the Parliamentarian's Office*

Despite the clear indications that they should leave, the mob of rioters continued to charge forward into the police line. *E.g.*, Trial Ex. 308. The mob grabbed the rioter under arrest and pulled him back into the crowd. Trial Tr. 5/4/23 at 27-28. The rioters chanted "USA! USA! USA!" and screamed, "THIS IS OURS!"

The rioters successfully pushed the police line all the way back to the end of the hallway where the rioters then turned a corner. Trial Tr. 5/4/23 at 28; Trial Ex. 307. As the rioters turned

the corner, they chanted, "WHOSE HOUSE? OUR HOUSE!" and yelled "STOP THE STEAL!"

Trial Exs. 306, 307, 311, 312.



*Figure 3: Screenshot of Trial Ex. 311 at :33 showing Kelly (yellow circle)*
*chanting with crowd as the mob approaches and overruns the police line*

Around this time, when Kelly had made it to the end of the first hallway, he approached a

large bay window, looked out of the window next to a "STOP THE STEAL" sign, raised his fist

in the air, and smiled.



*Figures 4 & 5: Photographs of Kelly (yellow circle) looking out of a window*
*while he stood inside the U.S. Capitol building and raising his fist in the air as he smiled (right),*
*Trial Exs. 116 (left), 116.1 (right)*

Then, Kelly rejoined the mob and started down a second hallway. About halfway down the

hallway, the rioters, Kelly included, approached another police line. The rioters were "agitated,

aggressive, [and] loud." Trial Tr. 5/4/23 at 64, 65. The rioters banged flag poles on the ground,

chanted, and moved aggressively towards the officers. Trial Tr. 5/4/23 at 71 (rioters in the hallway were "violent and aggressive").

As the rioters reached the next line of officers, they faced another decision point. Trial Ex. 205. To the rioters' right, officers held a police line guarding a hallway that led into the Capitol building. Trial Tr. 5/4/23 at 69. To the rioters' front, officers held a police line guarding a hallway that led to steps that "go directly up to the Senate chamber." *Id.* To the rioters' left, there was a short hallway that opened to the North door and led to the outside. The officers tried to get the rioters to exit the Capitol building out of the North door, Trial Tr. 5/4/23 at 64-65, but most, like Kelly, refused, Trial Tr. 5/4/23 at 68 (officers were instructing rioters to "exit, head out, head out the door head that way").



*Figures 6 & 7: Screenshots of surveillance footage, Trial Ex. 205 at 1:50-2:00, showing Kelly (yellow circle) facing the North door, left, and then turning to join rioters facing off with the police lines, right*

Kelly stepped forward towards the police line until he was face-to-face with the officers guarding the stairway that led to the Senate Chamber. Trial Ex. 205 at 3:45.



*Figure 8: Screenshot of Capitol surveillance footage, Trial Exs. 205 at 3:01, 115.7, showing Kelly (orange box) face-to-face with a police officer who was trying to prevent rioters from passing the police line*

Rioters promptly started to "push and shove" the officers. Trial Tr. 5/4/23 at 69-70. One officer tried to push Kelly back, but Kelly physically resisted. Trial Ex. 205. The officers were increasingly more outnumbered and they felt "helpless." Trial Tr. 5/4/23 at 72. After tussling with the officers, one rioter at the front of the police line near Kelly stepped through the police line. When an officer turned his body to grab that rioter, Kelly saw a split-second opening. He took a step forward and physically created a gap for all the rioters behind him to "pour through" the now broken police line. Trial Tr. 5/4/23 at 71; Trial Ex. 205 at 3:16-3:19.

From there, Kelly ascended the same set of stairs that the Vice President of the United States had recently descended as part of an emergency evacuation. Trial Exs. 119, 202, 312.



*Figures 9 & 10: Screenshots from surveillance footage showing Vice President Pence, left (red circle, Trial Ex. 202), in an emergency evacuation from the Senate Chamber, and Kelly, right (yellow circle, Trial Ex. 206), ascending the same staircase shortly after*

Once on the second floor, Kelly made his way onto the Senate floor, a "sacred place" in the Capitol building that not even Capitol Police officers are permitted to occupy when Congress is in session. Trial Ex. 120; Trial Tr. 5/4/23 at 57, 125-126, 132. The rioters quickly outnumbered the sole police officer standing guard in the chamber, who was scared as the rioters flooded the chamber, yelling and screaming, and going through the Senators' desks, documents, and belongings. Trial Tr. 5/4/23 at 125, 134. Kelly immediately approached the head of the room – at the Senate Dais – where the Vice President had recently presided over the Senate during the joint certification of the electoral college vote. Trial Tr. 5/3/23 at 194.



*Figures 11 & 12: Screenshots from surveillance footage showing Vice President Pence, left (red circle, Trial Ex. 23), sitting at the Dais as he presides over Congress in the Senate Chamber, and Kelly, right (yellow circle, Trial Ex. 501), standing at the Dais taking a video of the Vice President's documents shortly after*

Kelly began rustling through and taking video footage of the sensitive documents on the Vice President's desk, including a ballot sheet, handwritten notes, and a script. Trial Exs. 108, 109, 120.1, 410, 704; Trial Tr. 5/3/23 at 194 ("[N]ot even senators are supposed to take photographs.").



*Figures 13, 14, 15, & 16: Screenshots of video footage showing Kelly (top, yellow circle) taking a video of sensitive paperwork (bottom), Trial Exs. 108, 108.2, 109, on the Vice President's desk inside the Senate Chamber, Trial Exs. 501, 120.1*

As Kelly rustled through the Vice President's desk, a rioter nearby screamed, "THIS IS OUR HOUSE! THIS IS WHAT YOU DO WHEN YOU TAKE IT!" Trial Ex. 314. Kelly then joined a group of rioters and "prayed" to "send a message to the tyrants, the communists, and the globalists that this is our nation, not theirs." Trial Exs. 313.1 at 4:10, 411.



*Figure 17: Screenshot of surveillance video footage, Trial Ex. 120.2, showing Kelly (yellow circle) kneeling on the Senate floor during the rioters' prayer to "send a message to the tyrants, the communists, and the globalists"*

Kelly then approached a second desk and rustled through paperwork on that desk while taking photos of those documents.



*Figure 18: Screenshot of surveillance video footage, Trial Ex. 120.3, showing Kelly (yellow circle) taking photos of sensitive documents at a desk on the Senate floor*

As officers started to enter the Senate Chamber to clear rioters out, Kelly exited. He made his way back to the North door and exited the Capitol building. As he walked out of the Capitol, he pumped his fist in the air, and he smiled.

 

*Figures 19 & 20: Screenshot of Kelly (yellow arrow), Trial Exs. 123.2 (left) & 123.3 (right), pumping fist in air and smiling as he exits the Capitol building*

After his time in the Capitol building, Kelly did not immediately leave the Capitol grounds. Instead, he walked around to the East side of the Capitol building and joined rioters there. Trial Ex. 412. Then, he then walked back to the West front and continued to document the still-ensuing chaos. Trial Ex. 413.

When Kelly eventually left the Capitol grounds, he sent text messages to his mother declaring, "I am not dead and not in jail" and "I'm safe and sound. Only a little tear [g]as in the back of my throat." Trial Ex 604.1 at 19. Kelly sent the photos that he took in the Senate Chamber to several individuals, including a reporter, and he sent video footage of the siege to his friends. He told his friend afterward that it was "Crazy times" at the Capitol. *Id.* at 27.

## III.    THE CHARGES AND TRIAL

On December 3, 2021, a federal grand jury returned an indictment charging Kelly with seven counts, including: (1) Obstruction of an Official Proceeding and Aiding and Abetting, 18 U.S.C. §§ 1512(c)(2) and 2; (2) Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1); (3) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2); (4) Entering and Remaining on the Floor of Congress, 40 U.S.C.

§ 5104(e)(2)(A); (5) Entering and Remaining in Certain Rooms in the Capitol Building, 40 U.S.C. § 5104(e)(2)(C); (6) Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and (7) Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G). ECF No. 27.

On May 9, 2023, the defendant was convicted of all seven counts following a jury trial.

## IV.   STATUTORY PENALTIES

The defendant now faces sentencing on the seven counts of the Indictment. As noted by the Presentence Report issued by the U.S. Probation Office, the defendant faces the following penalties:

- Count One (Obstruction of an Official Proceeding): up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

- Count Two (Entering and Remaining on a Restricted Building of Grounds): up to one year imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25.

- Count Three (Disorderly and Disruptive Conduct in a Restricted Building or Grounds): up to one year imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25.

- Count Four (Entering and remaining on the Floor of Congress): up to six months imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

- Count Five (Entering and Remaining in Certain Rooms in the Capitol Building): up to six months imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

- Count Six (Disorderly Conduct in a Capitol Building): up to six months imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

- Count Seven (Parading, Demonstrating, or Picketing in a Capitol Building): up to six months imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government has calculated the defendant's Guidelines range as follows:

Count One: 18 U.S.C. §§ 1512(c)(2) and 2

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[2] | +3 |
| | **Total** | **17** |

Count Two: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Special Offense Characteristic (Restricted Building or Grounds) | +2 |
| U.S.S.G. § 2B2.3(c)(1) | Cross Reference (Intent to Commit Felony) | |
| U.S.S.G. § 2X1.1(a) | Base Level Offense (Adjusted – From Count One) | 17 |
| | **Total** | **17** |

---

[2] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. The evidence presented at trial shows that Kelly traveled to Washington, D.C. and joined in the riot to stop the certification of the Electoral College vote count. Further, the riot resulted in evacuations, vote count delays, officer injuries, and more than 2.9 million dollars in losses. As described herein, law enforcement officials from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

<u>Count Three: 18 U.S.C. § 1752(a)(2)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | <u>10</u> |
| | **Total** | **10** |

<u>Counts Four, Five, Six, and Seven</u>: Class B misdemeanors to which the Sentencing Guidelines do not apply. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9.

**Total Adjusted Offense Level:[3]**                                **17**

The U.S. Probation Office calculated Kelly's criminal history as category I, which is not disputed. PSR ¶ 48. Accordingly, based on the government's calculation of the total adjusted offense level, at 17, Kelly's Guidelines imprisonment range is 24 to 30 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Kelly's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Kelly traveled to Washington, D.C. after vocalizing complaints about the alleged fraudulent election and his intent to ensure the former president remain in power,

---

[3] Under U.S.S.G. § 3D1.2(a) and (c), "closely related counts" group. Counts One, Two, and Three comprise a single group under U.S.S.G. §3D1.2(a) and (b) because the victim of each count is Congress. Under U.S.S.G. §3D1.3(a), the offense level for a group of closely related counts is the highest offense level of the counts in each group. The highest offense level is 17 (for Counts One and Two). Therefore, the combined offense level for the group is 17.

and that's exactly what he tried to do. Before January 6, he warned that "it's not over" and that "nothing can stop what is coming." On January 6, Kelly joined a mob that overran the police officers charged with protecting the Capitol building, and he made it to the heart of the building: the Senate Floor. Kelly ascended the same set of stairs the Vice President had recently evacuated down, and after he made it to the Senate floor, he proudly stood at the Vice President's desk. Wasting no time, Kelly took photos and videos of sensitive documents, which he later sent to friends and a reporter. After finally leaving the building, Kelly pumped his fist in the air, proud of his accomplishments. The nature and circumstances of Kelly's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 27 months' imprisonment.

### B.  The History and Characteristics of the Defendant

Kelly is college-educated and works as the Vice President of Finance at his family-owned company, 2PiFi, a wireless internet service company. PSR ¶ 54, 75. He has maintained steady employment throughout his adult life. PSR ¶ 79. Kelly has one prior conviction for operating while intoxicated in 2010. PSR ¶ 47.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. The defendant's criminal conduct – particularly on the Senate floor – on January 6 was the epitome of disrespect for the law.

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a lengthy term of incarceration. Kelly's failure to express remorse or acknowledge the seriousness of his conduct, combined with his rhetoric leading up to January 6, and his actions on January 6, requires a sentence sufficient to specifically deter Kelly from participating in future, violent riots.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("[A]s far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and

balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

First, in *United States v. Mitchell*, 21-cr-508 (BAH), the defendant Landon Mitchell made numerous posts on social media prior to January 6, such as "Joe Biden IS NOT MY PRESIDENT" and "I'll be in DC Jan. 6th! Whose [sic] coming with me?" He anticipated violence as he posted statements like, "if we don't fight now there is no point in ever voting again." On January 6, after attending the "Stop the Steal" rally, Mitchell marched to the Capitol grounds and took video footage of rioters climbing on scaffolding and police officers attempting to defend the building. Nevertheless, Mitchell unlawfully entered the building. While roaming the building, Mitchell chanted, "WHOSE HOUSE? OUR HOUSE!" Mitchell eventually made it to the Senate Chamber and entered onto the Senate Floor. While there, Mitchell leafed through and examined documents on Senators' desks, ascended the Senate Dais, and posed for pictures, including next to the self-proclaimed "QAnon Shaman," Jacob Chansley. Following January 6, Mitchell continued voicing pride in his actions, including stating that "the people who breached the capitol were heroes and patriots." Judge Howell sentenced Mitchell to 27 months' incarceration.

Like Mitchell, prior to January 6, Kelly was vocal about his view that the recent presidential election had been stolen. Kelly sent a text message proclaiming that "Joe Biden is not president," and he prepared for the riot, forebodingly warning that "nothing can stop what is coming." Kelly attended the rally and after marched to the Capitol, joining the chaos and growing the mob. Like

Mitchell, Kelly video recorded people climbing on scaffolding, rioters breaching the building, and rioters dressed in tactical gear. After unlawfully entering the building, Kelly, also like Mitchell, roamed the halls of the Capitol building chanting "WHOSE HOUSE? OUR HOUSE!" as he neared the Senate Chamber. After entering the Senate Chamber onto the Senate Floor, Kelly proudly stood at the Senate Dais, leafing through sensitive documents and taking videos and photos of those documents. After January 6, Kelly, again like Mitchell, failed to accept responsibility or express remorse for his actions. Although Kelly did not make public statements on social media like Mitchell prior to and following January 6, Kelly made comparable statements in text messages to several friends. Also, Kelly was at the forefront of the mob that pushed through an officer line near the North door, which allowed the mob to access the Senate Chamber, and Kelly also entered the Parliamentarian's Office. Therefore, a comparable sentence is warranted for Kelly.

Next, in *United States v. Jacob Chansley*, 21-cr-003 (RCL), the defendant Jacob Chansley used his social media presence to spread false information and hateful rhetoric prior to January 6. He wrote things like, "We shall have no real hope to survive the enemies arrayed against us until we hang the traitors lurking among us." After reaching the Capitol on January 6, Chansley entered the scaffolding amongst utter chaos on the West front. Chansley joined other rioters in pushing past the police line at the top of the scaffolding and entering the Upper West Terrace. Chansley was then one of the first 30 rioters who illegally entered the Capitol building. Eventually, after confrontations with police officers in the Ohio Clock Corridor and then being stopped by police in the Senate Gallery, Chansley made his way to the Senate Floor. Chansley ascended the Senate Dais where he wrote a threatening note to the Vice President stating "It's Only A Matter of Time. Justice Is Coming!" Chansley repeatedly ignored officers' commands to leave, instead proclaiming

"Mike Pence is a fucking traitor." Then, he called other rioters to the Dais and led them in an incantation over his bullhorn, including giving thanks for the opportunity "to allow us to send a message to all the tyrants, the communists, and the globalists, that this is our nation, not theirs, that we will not allow America, the American way of the United States of America to go down." When officers arrived on the Senate floor, Chansley screamed "FREEDOM" in his bullhorn as he was being escorted from the building. After January 6, Chansley gave interviews to news outlets and said things like, "the fact that we had a bunch of our traitors in office hunker down, put on their gas masks and retreat into their underground bunker, I consider that a win." This Court sentenced Chansley to 41 months' incarceration, acknowledging his calls for violence, but his extremely early acceptance of responsibility.

Here, the defendant, like Chansley, made his way through the chaos on the West front to reach the Capitol building. Like Chansley, Kelly had several confrontations with police officers including when Kelly pushed through a police line to allow a flood of rioters to access the Senate Chamber. Kelly, also like Chansley, repeatedly ignored officers' orders to leave. Kelly eventually made it to the Senate floor and stood at the Senate Dais alongside Chansley. After Chansley wrote a message to the Vice President, Kelly took a photo of that message, which he later sent in text messages to a reporter and his friends. Kelly joined in Chansley's incantation while kneeling at the Senate Dais. Kelly then continued taking photographs and video footage of another desk on the Senate Floor. Although the defendant has yet to express regret or remorse for his actions, he, unlike Chansley, did not provide comparable statements to the news media after January 6, nor did

he write a threatening message to the Vice President or engage in other violent rhetoric. Therefore, a term of incarceration comparable to but less than Chansley's sentence is appropriate here.[7]

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Kelly was convicted of a violation of an offense under Title 18, and thus

---

[7] Chansley's Sentencing Guidelines Range was higher than Kelly's. In Chansley's case, U.S.S.G. § 2J1.2(b)(1)(B) was applicable, which increased the base offense level by 8 points, because the offense involved causing or threating to cause physical injury to a person in order to obstruct the administration of justice, namely, Chansley's threatening language towards lawmakers and the note he left for the Vice President on the Dais. Unlike Kelly, however, Chansley entered into a plea agreement and thus received a 3-point deduction for acceptance of responsibility under U.S.S.G. § 3E1.1. Therefore, Chansley's total offense level was 22, whereas Kelly's is 17.

the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[8]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion

---

[8] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Kelly to pay $2,000 in restitution for his convictions on Counts One through Seven. This amount fairly reflects Kelly's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months' imprisonment, 36 months of supervised release, $2,000 in restitution, a

mandatory $190 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     /s/ Ashley Akers
        ASHLEY AKERS
        Trial Attorney
        U.S. Department of Justice
        Detailed to the D.C. U.S. Attorney's Office
        601 D Street, N.W.
        Washington, D.C. 20530
        Ashley.Akers@usdoj.gov
        (202) 353-0521

        GREGORY ROSEN
        Assistant United States Attorney
        VA Bar No. 82584
        United States Attorney's Office
        District of Columbia
        601 D Street N.W.
        Washington, D.C. 20530
        Gregory.Rosen@usdoj.gov
        (202) 252-6932